Opinion
 

 DABNEY, J.
 

 Defendant Jose Juan Garnica appeals his convictions of two counts of first degree murder (Pen. Code, § 187, subd. (a)), and one count of
 
 *1560
 
 conspiracy to commit murder (Pen. Code, §§ 182, 187). The jury found true a multiple-murder special-circumstance allegation (Pen. Code, § 190.2, subd. (a)(3)) and, with respect to each of the murder counts, found true allegations that defendant had personally used a firearm in the commission of the murders (Pen. Code, § 12022.5). Defendant was sentenced to two concurrent life terms without possibility of parole (LWOP) for the murders. He received an additional concurrent term of 25 years to life for the conspiracy. The court added a five-year gun use enhancement under count 1, and a concurrent five-year gun use enhancement under count 2.
 

 Defendant appeals, contending (1) the trial court improperly answered a jury inquiry, (2) the sentence for his conspiracy conviction should have been stayed, (3) one of the life terms for the murders should have been stayed under Penal Code section 654 because it constitutes double punishment for the same act, and (4) the court erred in imposing multiple gun use enhancements. We agree that the sentence must be modified to stay punishment on the conspiracy count and that one of the gun use enhancements should be stayed. We otherwise reject defendant’s contentions, however, and affirm the judgment.
 

 Facts
 

 On August 6, 1991, defendant shot and killed Derrick Jackson and Anthony Gonzales, who were standing outside a convenience store in Ontario, California. The prosecution presented evidence to indicate that defendant shot the victims because they or their associates had previously shot at and attempted to kill defendant’s cousin, David Garnica.
 

 In the late afternoon of August 6, 1991, Eliapo “Junior” Sega was riding with his cousin, Robert Sega, and Robert’s girlfriend in the girlfriend’s Suzuki Sidekick. As they passed a convenience store on Mountain Avenue, Junior recognized Derrick Jackson, Anthony Gonzales and Juan Arreola near the telephone booths outside the store. Junior was a member of the Sons of Samoa gang, and he recognized Jackson, Gonzales and Arreola as members of another gang. Junior testified that the three gang members “mad-dogged” him; he responded by “throwing” his S.O.S. (Sons of Samoa) gang sign, and they in turn “threw” the sign of the 18th Street gang and shouted out their 18th Street gang affiliation. Arreola testified that he recognized Junior from Montclair High School. As the Suzuki drove away, Junior told Robert that “those were the guys” he had fought with earlier.
 

 As Junior, Robert and Amber Carlson (Robert’s girlfriend) were driving toward Robert’s house, they saw defendant and defendant’s cousin, David
 
 *1561
 
 Garnica, in a white Riviera automobile. They told defendant and David that they had just confronted some 18th Street gang members at the convenience store. Junior, Robert, Amber, defendant and David all then proceeded to Robert’s house.
 
 [1]
 
 The discussion continued in front of the house. Junior said he saw the guys who had shot at David Garnica at school earlier in the year. Defendant then said, “Let’s go do it.”
 

 David drove defendant and Junior to the convenience store. David let Junior and defendant out of the car near the store. Junior testified he knew that defendant had a gun, so he let defendant go on alone while he started walking home.
 

 Juan Arreola went inside the convenience store as defendant was approaching. He did not see the confrontation. Carmen Gonzales was parking her truck in front of the convenience store, and witnessed the attack on Jackson and Anthony Gonzales. She heard defendant say something to two young Mexicans standing near the telephone booths; the Mexican youths answered. Defendant pulled out a gun and shot one of the victims. The other victim pushed defendant, and defendant “just started shooting rounds.” Carmen Gonzales did not see that the victims had anything in their hands when defendant shot them.
 

 Deborah Meraz, another eyewitness, saw defendant shoot one person and, after that person fell, defendant shot at the second person. Defendant continued to shoot both victims while standing over them as they lay on the ground. Meraz also did not see either victim with anything in his hands when defendant fired.
 

 After the shooting, Jesus Flores saw defendant walking casually away. David Garnica picked up defendant in the white Riviera, and they drove back to Robert Sega’s house. When they arrived back at the house, defendant told Robert, “You should have been there, I shot him, I shot him.” Junior arrived back at the house a short while later. Defendant changed clothes at Robert’s house. Junior took the gun, which defendant had apparently left on Robert’s bed, wrapped it up and threw it in some weeds along the side of the house.
 

 Defendant was arrested later that night. After he was advised of his constitutional rights, defendant talked to police. Defendant at first denied any knowledge of the shooting. Then he admitted shooting the victims “because they shot my cousin.” Defendant told police he shot the victims because one of the victims tried to hit him with a bottle, and because the victims faked pulling weapons out of their pockets.
 

 
 *1562
 
 The forensic evidence showed Derrick Jackson had been shot six or seven times. Several shots had been fired while Jackson was down on the ground, and all the shots were fired from Jackson’s back or side. Anthony Gonzales had been shot four times. The fatal shot was fired while Gonzales was down on the ground, and most if not all the shots were fired from behind, as if Gonzales were running away.
 

 Defendant testified in his own behalf at trial. Defendant testified that he did not intend to shoot anyone when he went to the convenience store. He wanted to confront them and might have fought them with his fists. Defendant denied saying, “Let’s go do it”; he testified that he had only said “Let’s go.” Defendant testified that one of the victims had something in his hands when defendant approached. When defendant tried to ask the victims about the prior attempt to shoot David Garnica, the victims just laughed and said, “So what?” One of the victims said, “Let’s get him,” and they moved toward defendant. One of the victims threw something at defendant, and the other reached into his pocket. Defendant became angry and started shooting. The jury found defendant guilty of first degree murder with a multiple-murder special circumstance as to each victim. The jury also found defendant personally used a firearm in the killings. Defendant was also convicted of conspiracy to commit murder. Defendant filed a timely notice of appeal.
 

 Discussion
 

 I., II
 
 *
 

 III.
 
 Concurrent Life Terms for Two Murders
 

 Defendant also argues that the trial court violated Penal Code section 654 in sentencing him to two concurrent terms of life in prison (LWOP). Defendant contends the sentences for the two murders constitute impermissible double punishment for the “same act,” i.e, the act of committing two murders. That is, his sentence as to
 
 each
 
 murder was enhanced to LWOP because of the
 
 other
 
 murder. He appears to argue that, because there can be only one multiple-murder special-circumstance allegation, there can be only one LWOP sentence. We disagree.
 

 Penal Code section 190.2, subdivision (a)(3) provides in relevant part that “The penalty for a defendant found guilty of murder in the first degree shall
 
 *1563
 
 be death or [LWOP] in any case in which one or more of the following special circumstances has been charged and specially found . . . true.
 

 “(3) The defendant has
 
 in this proceeding
 
 been convicted of more than one offense of murder in the first or second degree.” (Italics added.)
 

 The multiple-murder special circumstance is a legislative choice to treat as deserving of the most severe punishment a murderer convicted of
 
 more than one
 
 murder. In any one proceeding in which such a finding is made, the fact that a murder is one of multiple murders applies equally to
 
 all
 
 the murders of which the defendant is convicted.
 
 Each
 
 of the murders is deemed the more heinous because it is one of
 
 multiple
 
 killings. We cannot gainsay this legislative determination.
 

 Defendant can take no comfort from those cases holding that, regardless of the number of murders committed, only one multiple-murder special circumstance can be charged. (See, e.g.,
 
 People
 
 v.
 
 Anderson
 
 (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306];
 
 People
 
 v.
 
 Hamilton
 
 (1988) 46 Cal.3d 123, 144 [249 Cal.Rptr. 320, 756 P.2d 1348].) The problem with charging “multiple” multiple-murder special circumstances, is the “inflate[d] . . . risk that the jury will arbitrarily impose the death penalty, . . .”
 
 (People
 
 v.
 
 Harris
 
 (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433]), because of the sheer number of special circumstances charged and found true. Where the death penalty has not been sought, that concern should not be an issue, and it does not change the fundamental truth that all the murders in a multiple-murder crime spree have been deemed worthy of the ultimate penalty precisely because they are part of a multiple-murder sequence.
 

 The California Supreme Court has expressly held it is proper to require the jury to make separate penalty determinations on
 
 each
 
 of several capitalligible counts: in
 
 People
 
 v.
 
 Sandoval
 
 (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862], the court stated that “A defendant who kills more than one person may be convicted and punished for each murder. [Citations.] Separate penalty verdicts have been returned in other capital cases. The defendant in
 
 People
 
 v.
 
 Bittaker
 
 (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659] was convicted of first degree murder of five victims and was given separate death verdicts as to each murder victim. [Citation.] Likewise, the defendant in
 
 People
 
 v.
 
 Mattson
 
 (1990) 50 Cal.3d 826 [268 Cal.Rptr. 802, 789 P.2d 983], who was convicted of the first degree murder of two girls,
 
 *1564
 
 was given a separate verdict of death as to each murder victim. [Citation.] We are not persuaded that there was any impropriety in requiring the jury to return a separate penalty verdict for each capital murder count.”
 
 (Sandoval, supra,
 
 4 Cal.4th at p. 197.) Thus, the court upheld one verdict of death and three verdicts of LWOP for four counts of murder in which the sole special circumstance was an allegation of multiple murder. The court has also upheld, without discussion, four death penalties for four murders where the court struck three of four multiple-murder special circumstances and no other special circumstances were charged.
 
 (People
 
 v.
 
 Bonin
 
 (1988) 46 Cal.3d 659, 668, 691 [250 Cal.Rptr. 687, 758 P.2d 1217].) Based on these authorities, it was not improper to impose LWOP sentences for each eligible murder.
 

 Both parties state that this is an issue of first impression. The issue may not have been addressed in a published case because there could be little practical impact or prejudice from imposition of multiple death or LWOP verdicts. In reality, defendant can serve only one such sentence, no matter how many are imposed and no matter whether they are consecutive or concurrent. An LWOP defendant can effectively serve only one life sentence. There are reasons, however, to permit imposition of multiple LWOP sentences. As noted, it has been legislatively determined that multiple murder is especially deserving of the most severe punishment. Neither from a legislative point of view nor from the perspective of the victims’ families is there any valid basis upon which to single out any one murder as less deserving of full punishment than the others. Moreover, it is a remote but real possibility that one or another of the sentences might be commuted by the governor. If only one LWOP was imposed and the governor were to commute the sentence on that conviction, Penal Code section 190.2, subdivision (a)(3) should still apply and require a sentence of LWOP on any remaining first degree murder conviction, because there was in fact more than one murder conviction. Yet, the trial court could not thereafter change the sentence to convert the remaining conviction to an LWOP. For these reasons, we hold the trial court is not precluded from imposing either concurrent or consecutive LWOP sentences for each of the first degree murder convictions based on the single multiple-murder special circumstance. This will ensure that a defendant will still serve an LWOP sentence in the unlikely event all but one LWOP should be commuted.
 

 Finally, we cannot conceive that defendant would suffer any actual prejudice from the imposition of more than one LWOP sentence, whether consecutive or concurrent. Accordingly, any possible error would not be reversible.
 

 
 *1565
 
 IV., V.
 
 *
 

 Disposition
 

 The abstract of judgment should be modified to reflect that the term for the conspiracy count (count 3) and the gun use enhancement on count 2 are stayed. Otherwise, the judgment is affirmed.
 

 Ramirez, J., and McKinster, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied February 16, 1995.
 

 [1]
 

 Junior also resided at the house with his cousin (Robert) and his uncle (Robert’s father).
 

 *
 

 See footnote,
 
 ante,
 
 page 1558.
 

 *
 

 See footnote,
 
 ante,
 
 at page 1558.