Filed 5/1/13  P. v. Nash CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B235059 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. NA082024) |
| EMANUEL NASH, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge.  Affirmed as modified.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Emanuel Nash appeals from a judgment of conviction on two counts of first degree murder.  With respect to the second count, Nash contends

that the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter on a heat of passion theory, and further asserts that the court should have instructed the jury that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder. Nash also challenges his sentence, contending the trial court (1) improperly imposed separate terms of life without the possibility of parole as to each murder count; (2) improperly applied sentence enhancements pursuant to Penal Code section 12022.53, subdivision (d)[1] in violation of California law and federal double jeopardy principles; and (3) erroneously imposed a parole revocation fine even though he had no possibility of being paroled. With the exception of the parole revocation fine, which we agree must be stricken, we find no error and affirm the judgment.

## BACKGROUND

I. *Charges*

Nash was charged with two counts of first degree murder (§ 187, subd. (a)), the first for the killing of Deandre Wynn on April 29, 2009, and the second for the killing of Shawn Eleby on May 3, 2009. Both counts were alleged as serious felonies within the meaning of section 1192.7, subdivision (c)(8), and violent felonies within the meaning of section 667.5, subdivision (c). It was further alleged that, in the commission of the crimes, Nash personally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c), (d)) and that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd.

---

[1] Subsequent undesignated references to code sections are to the California Penal Code.

2

(b)(1)(C)).  A multiple-murder special circumstance was alleged as to counts 1 and 2 within the meaning of section 190.2, subdivision (a)(3).  Nash also was alleged to have suffered a prior strike conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), and to have served a prior prison term (§ 667.5, subd. (b)).  Trial was by jury.

II.     *Pertinent Evidence at Trial*

Because Nash does not challenge the sufficiency of the evidence to support the convictions, we only briefly discuss the evidence, except where the fuller details are necessary to issues in this appeal.

A.     *Shooting of Deandre Wynn*

On April 29, 2009, Deandre "Mayhem" Wynn was in an alley located at 1170 East South Street in Long Beach, drinking beer and smoking marijuana with Tom Murphy, Kevin Maxwell, and Kejuan Bryant.  A dark-skinned black male in his 20's with an "S" tattooed on the right side of his neck, later identified as Nash, got out of a silver car, approached them, and asked, "Where's the weed?"  Wynn told Murphy not to sell Nash any because they did not know him.  Murphy asked Nash who he was and he responded that he was "E-Man" from "Sex Money."  Nash spoke with Wynn, who said he was "Mayhem from Boulevard."  As discussed further below, the Sex, Money, Murder gang is a rival of the Boulevard Mafia Crips gang.  Nash turned as if he was leaving, then pulled a gun from his waistband and fired four or five gunshots.  Wynn and Maxwell were both struck by bullets.

A resident of the area heard the gunshots and looked out his window overlooking the alley.  He saw a black male enter the passenger's side of a car which then sped off down the alley.  The resident wrote down a partial license

3

plate number, 4ZCU, and gave it to the police. Windellyn Osbourne, who dated Nash in April and May 2009, had lent Nash her gray car, with license plate number 4ZCU675.

At the hospital, Maxwell's father told the police that Maxwell told him someone from Sex, Money had shot him. Maxwell survived his gunshot wounds. However, Wynn, who was struck in the back by three bullets, died as a result of the wounds. A bullet recovered from his body was booked into evidence.

On May 11, 2009, Long Beach Police Detective Teryl Hubert showed Murphy a photographic lineup. Murphy circled a photograph of Nash and identified him as "E." Murphy also identified from surveillance photos the vehicle that E had arrived in. In addition, cell phone records showed that calls were made from or to Nash's phone in the general area of the Wynn shooting shortly after the shooting.

B.    *Shooting of Shawn Eleby*

On May 3, 2009, Shawn Eleby, Brittany Vaughn (Eleby's sister and Wynn's best friend), and Monica Reddix were at a carwash fundraiser to raise money for Wynn's funeral expenses. Vaughn saw Nash there and he gave her a "mean look." One of Vaughn's friends pointed to Nash and said, "There goes E-man."

Later that evening, while attending a candlelight vigil for another friend who had been murdered that day, Reddix heard Kejuan Bryant say that "E-Man" shot Wynn. Reddix left the vigil and dropped some friends at Vaughn's house. As she was driving away, she noticed a gray Pontiac that began following her car. She drove to the place where her child was staying, got out of her car, and saw the Pontiac park nearby. Looking through the passenger side of the Pontiac, Reddix saw Nash sitting in the driver's seat. Reddix had known Nash since 1995 and they

4

had lived in neighboring apartment complexes. She knew him to be a member of Sex, Money, Murder. Nash backed the car up quickly and drove away southbound on Butler Avenue. Shortly afterwards, Reddix heard five or six gunshots.

Vincent Camper and his cousin Elijah were driving near the intersection of Butler and Cummings Lane at 10:00 p.m. that night. Camper noticed that the car in front of him had come to a stop for no apparent reason after crossing through an intersection. Camper then saw a black male in his 20's standing in the street leaning into the driver's window of a car, talking to the driver, who was later identified as Eleby. Camper's passenger pointed out that the man outside the car had a gun, and Camper saw that the man was holding a gun in his right hand while gesturing with his left hand. Camper testified that he "didn't hear what they were saying, but it seemed as though they may have been in some sort of exchange, heated exchange." He then watched as the shooter "raised up, took a half-step back, basically dropped to his right leg, raised the gun and fired five shots."

Eleby was hit by seven bullets, and six of the gunshot wounds were potentially fatal, including three to his head. Two bullets were recovered from his body. A criminalist determined that the bullets recovered from Eleby's and Wynn's bodies were fired from the same gun.

Cell phone records for Nash's phone showed calls that were made in the vicinity of and around the time of the Eleby shooting.

The police arrested Nash and his girlfriend Myeisha Blackburn in a motel room in Fontana, California on May 12, 2009. They had spent the night there because Nash told Blackburn that he needed to get away because some people were saying he was involved in shootings with the Boulevards in Long Beach. When Blackburn asked if he "did it," he only smirked.

5

## C. *Gang Evidence*

Long Beach Police Officer Chris Zamora testified as the People's gang expert. Sex, Money, Murder is a violent gang in North Long Beach. The members identify themselves with a dollar sign and the letter "S." Nash is an active member. He has gang tattoos, including anti-Crips tattoos and one that says "E-Man." In recordings of two jailhouse telephone calls between Nash and another caller, Nash referred to himself as a "soldier."

The Boulevard Mafia Crips gang is a rival of Sex, Money, Murder. Sex, Money, Murder would lose face within the gang culture if they did not retaliate when the Boulevard gang crosses out Sex, Money, Murder graffiti.

Two days before the shooting, Murphy saw some graffiti in the Sex, Money Murder gang territory indicating there might be a problem between the Boulevard Mafia Crips and the Sex, Money Murder gang. He saw graffiti that said "69 BMC," short for Boulevard Mafia Crips, which had been crossed out, with "SMM," short for Sex, Money, Murder, written next to it. Photographic evidence also suggested that Sex, Money, Murder's graffiti had been crossed out in their own territory by the Boulevard Mafia Crips, conduct which often would give rise to violent retaliation by Sex, Money, Murder.

Both Wynn and Eleby were members of the Boulevard Mafia Crips. Wynn was shot close to Boulevard Mafia Crips territory and within a few blocks of Sex, Money, Murder territory. Eleby was shot in Boulevard Mafia Crips territory. When given hypotheticals based on the Wynn and Eleby shootings, Officer Zamora opined that they were committed for the benefit of, at the direction of, or in association with the Sex, Money, Murder gang.

## III. *Jury Instructions*

6

During a conference on jury instructions, the trial court indicated the CALJIC instructions that it intended to give, and told counsel that if they did not interpose any objections they would be deemed to have consented to the instructions. As relevant here, the court indicated that it would give the CALJIC instructions on first and second degree murder, but indicated that it did not intend to give a voluntary manslaughter instruction on a heat of passion theory: it stated that "I understand there may be gang wars going on, but for a gang member to say, well, we have a gang war and I'm really upset at the opposing gang and then to choose the time, place and manner of shooting [makes] that person . . . the judge, jury and executioner of any person. . . . I think that the theory in this case for Mr. Nash's behalf is that he is not the one and that the evidence is not proven beyond a reasonable doubt." Defense counsel responded that the court was correct in its assessment, and that the defense was not asking that instructions on any lesser offenses be given. The court concluded by finding no substantial evidence to give any instruction on lesser offenses.

IV.    *Verdict and Sentencing*

The jury found Nash guilty of first degree murder as charged in each count and found all the special allegations true. Following a bifurcated court trial, the court found the prior conviction and prison term allegations true.

The court sentenced Nash to LWOP on each count, doubled pursuant to section 1170.12, subdivisions (a)-(d), plus 25 years to life for each count pursuant to section 12022.53, subdivision (d), plus five years pursuant to section 667, subdivision (a)(1), and one year pursuant to section 667.5, subdivision (b). Along with other fees and restitution, the court imposed and suspended a $10,000 parole revocation fine under section 1202.45.

**DISCUSSION**

I.    *Jury Instructions*

A.    *Voluntary Manslaughter Based on Heat of Passion*

Nash contends that the trial court should have instructed the jury sua sponte on the lesser included offense of voluntary manslaughter with respect to the shooting of Eleby, given evidence that there was a "heated exchange" between Nash and Eleby just prior to the shooting as well as evidence that the two were members of rival gangs. Further, he contends that the failure by Nash's counsel to seek such an instruction constituted ineffective assistance of counsel.

1.    *Foundation Required for Heat of Passion Instruction*

"'The Penal Code defines manslaughter as "the unlawful killing of a human being without malice." (§ 192.) The offense is voluntary manslaughter when the killing is "upon a sudden quarrel or heat of passion." (*Id.*, subd. (a).) . . . [M]anslaughter has been considered a lesser, necessarily included, offense of intentional murder. Generally, an intent to unlawfully kill reflects malice. [Citations.] An unlawful killing with malice is murder. (§ 187.) Nonetheless, an intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation . . . . [Citations.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).)

Heat of passion has both subjective and objective components that must be proved affirmatively. (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*); *People v. Lee* (1999) 20 Cal.4th 47, 60 (*Lee*).) "The defendant must actually, subjectively, kill under the heat of passion." (*Manriquez, supra*, 37 Cal.4th at p.

8

584; see *Enraca, supra*, 53 Cal.4th at p. 759; *People v. Breverman* (1998) 19 Cal.4th 142, 163 (*Breverman*).) To satisfy the objective component, the defendant's heat of passion must be due to "'sufficient provocation.'" (*Manriquez, supra*, 37 Cal.4th at p. 584.) In other words, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. Heat of passion "arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*Enraca, supra,* 53 Cal.4th at p. 759; see *People v. Barton* (1995) 12 Cal.4th 186, 201.) The provocation which incites the defendant to homicidal conduct in the heat of passion may be physical or verbal, although verbal provocation "must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee, supra,* 20 Cal.4th at p. 60; see *People v. Oropeza* (2007) 151 Cal.App.4th 73, 76, 83 [mutual yelling and offensive hand gestures exchanged between two cars on highway did not constitute adequate provocation for passenger of one car to shoot at other car]); *Manriquez, supra*, 37 Cal.4th at pp. 585-586.) Further, the victim must have caused the provocation, by taunting the defendant or otherwise initiating the provocation. (*People v. Avila* (2009) 46 Cal.4th 680, 705 (*Avila*); see *Lee, supra,* 20 Cal.4th at p. 59.)

"'"[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.]" (*Manriquez, supra,* 37 Cal.4th at p. 584; see *Avila, supra,* 46 Cal.4th at p. 705.) Thus, the California

9

Supreme Court has "rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca, supra,* 53 Cal.4th at p. 759; see *Avila, supra,* 46 Cal.4th at p. 706 ["[r]easonable people do not become homicidally enraged when hearing" a gang reference or challenge]; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [The standard is not the reaction of a "reasonable gang member."].)

In a murder case, the jury must be instructed on heat of passion if the theory has "substantial evidentiary support."[2] (*Breverman, supra*, 19 Cal.4th at p. 160.) In this context, substantial evidence means evidence from which a jury composed of reasonable persons could conclude that the lesser offense of voluntary manslaughter, but not murder, was committed. (*Manriquez, supra,* 37 Cal.4th at p.

---

[2] CALJIC No. 8.42 provides: "To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion. [¶] The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up [his] [her] own standard of conduct and to justify or excuse [himself] [herself] because [his] [her] passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted [him] [her] were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. Legally adequate provocation may occur in a short, or over a considerable, period of time. [¶] The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment. [¶] If there was provocation, whether of short or long duration, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed the provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

10

584; *Breverman, supra*, 19 Cal.4th at p. 162.) So long as the heat of passion theory is supported by substantial evidence, the trial court has a sua sponte duty to instruct on it even if the defendant objects to the instruction and regardless of the defendant's theory of defense. (*Breverman, supra*, 19 Cal.4th at p. 162.) On the other hand, a trial court "need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200; *Avila, supra,* 46 Cal.4th at p. 707.) We review de novo whether the trial court erred in not instructing on the lesser included offense of voluntary manslaughter. (*Avila, supra*, 46 Cal.4th at p. 705.)

### 2. *Insufficient Evidence of Provocation*

In contending that the trial court should have instructed on a lesser included offense of voluntary manslaughter on a heat of passion theory, Nash contends that evidence at trial provided a basis for the jury to infer that Eleby, a gang member, provoked Nash, a member of a rival gang.

The only evidence at trial regarding any interaction between Nash and Eleby prior to the shooting was provided during the testimony of Vincent Camper, an eyewitness to Eleby's shooting. Camper testified that just prior to the shooting he noticed that the car in front of him had come to a stop after crossing through an intersection, even though there was no stop sign there. He then saw the perpetrator (whose face he never saw) standing in the street leaning into the driver's window of a car, talking to the driver. Camper's passenger pointed out that the perpetrator had a gun, and Camper saw that he was holding a gun in his right hand while gesturing with his left hand. Camper testified that he "didn't hear what they were saying, but it seemed as though they may have been in some sort of exchange, heated exchange." He then watched as the shooter "raised up, took a half-step

11

back, basically dropped to his right leg, raised the gun and fired five shots." Camper immediately turned right at the intersection, circled around the block and returned to the scene, where he found the driver still seated in the car, riddled with bullets.

On cross-examination, Camper was ask to describe what he meant when he said the two men may have been having a "heated exchange." He said that the perpetrator was making hand gestures, including waving his left hand around his chest area as he bent over towards the driver. Camper did not get a clear look at what the driver was doing because the windows were tinted and it was "kind of dark," and so he could only see the silhouette of the driver's body. It appeared that the driver was leaning to his right while looking left towards the perpetrator.

Nash also relies on evidence at trial that Eleby and Nash belonged to rival gangs, Boulevard Mafia Crips and Sex, Money, Murder, respectively, and that Eleby's shooting occurred in Boulevard Mafia Crips territory that was within blocks of Sex, Money, Murder territory. Sex, Money, Murder's graffiti had been crossed out in their own territory by the Boulevard Mafia Crips, conduct which a gang expert testified often would give rise to violent retaliation by Sex, Money, Murder.

The above evidence of an exchange between Nash and Eleby prior to the shooting as well as the evidence of their gang rivalry does not constitute substantial evidence supporting a heat of passion theory. First, no evidence of provocation was presented at trial. Although Camper testified that he might have witnessed a "heated exchange" between Nash and Eleby, he testified that he could not clearly see what the man in the driver's seat, Eleby, was doing; he saw only Nash gesticulating with his hands while Eleby remained seated in the driver's seat. He did not testify that he saw or heard anything that would indicate that Eleby, and not

12

Nash, was the initial aggressor, or that Eleby was behaving aggressively or provocatively at any time. (*Avila, supra,* 46 Cal.4th at p. 706 [finding no substantial evidence of provocation to support manslaughter instruction where there was no evidence that the victim was the initial aggressor].)

Second, even if Eleby was a member of a rival violent gang that was challenging Nash's gang by crossing out their graffiti, the relevant standard is not whether a "reasonable gang member" would be provoked to homicidal rage given these facts and circumstances, but rather whether an ordinary reasonable person would be so provoked. (*People v. Humphrey, supra,* 13 Cal.4th at p. 1087; see *Enraca, supra,* 53 Cal.4th at p. 759.) Although Nash argues that we must consider Nash's conduct "in the context of the gang milieu" in which both Nash and Eleby lived, this "milieu" would not lead an ordinary reasonable person to rashly shoot another person. (*Enraca, supra,* 53 Cal.4th at p. 759.) Because insufficient evidence of provocation was presented, a jury could not reasonably have concluded that Nash acted under the heat of passion in killing Eleby. (*Manriquez, supra,* 37 Cal.4th at p. 584.)

For the same reasons, we reject Nash's alternate argument that his trial attorney was ineffective because he did not request a manslaughter instruction based on the heat of passion theory. Because there was no substantial evidence supporting the instruction, his counsel did not provide ineffective assistance by failing to request it.

### B. *Provocation Reducing Degree of Murder*

Nash also contends that the trial court erred in failing to instruct the jury using CALJIC No. 8.73, which provides that provocation inadequate to reduce a killing from murder to manslaughter may suffice to negate premeditation and

13

deliberation, thereby reducing the crime from first to second degree murder.[3]  He argues that even if an ordinary reasonable person would not have been provoked to kill and thus the manslaughter instruction was not supported, provocation sufficient to mitigate a murder to second degree murder requires only a finding that the defendant's *subjective* mental state was such that he did not deliberate and premeditate before deciding to kill.  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 ["If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder.  [Citation.]  If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter.  [Citation.]"]; *People v. Padilla* (2002) 103 Cal.App.4th 675, 678 ["The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective. . . .  The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective."]; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296.)

"Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction,'" i.e., an instruction intended to "pinpoint" the crux of a defendant's case.  (*People v.*

---

[3]     CALJIC No. 8.73, entitled "Evidence of Provocation May Be Considered in Determining Degree of Murder," reads as follows:  "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree."

*Rogers* (2006) 39 Cal.4th 826, 878 (*Rogers*); see *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) As Nash acknowledges, pinpoint instructions such as CALJIC No. 8.73 need be given only upon request and never on the court's own motion. (*Rogers, supra,* 39 Cal.4th at p. 879.) Nash thus forfeited this claim of error by failing to request this pinpoint instruction at trial. (*People v. Jennings* (2010) 50 Cal.4th 616, 675.)

Moreover, we reject Nash's related contention that his trial counsel rendered ineffective assistance by failing to request that the court instruct the jury with CALJIC No. 8.73. To establish ineffective assistance of counsel, a defendant must prove that (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, but for counsel's failings, the defendant would have received a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) Nash has the burden of establishing that his counsel was ineffective. (*In re Andrews* (2002) 28 Cal.4th 1234, 1253.) Moreover, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions. [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 442.)

Nash cannot satisfy his burden to show that he received ineffective assistance of counsel. To warrant being given, CALJIC No. 8.73 must be supported by substantial evidence. (*Avila, supra,* 53 Cal.4th at p. 707; see *Enraca, supra*, 53 Cal.4th at p. 760 ["CALJIC No. 8.73 is a pinpoint instruction that must be given, upon request, only if supported by substantial evidence."].) Where there is no evidence that the victim provoked the defendant, as here, the court need not

15

give the instruction even if it requested. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 ["We see no substantial evidence that the killings were provoked and that defendant was guilty only of the lesser offenses on which instruction was sought."]; *People v. Steele* (2007) 27 Cal.4th 1230, 1251 [where no evidence of provocation existed, court did not err in failing to give CALJIC No. 8.73].) Although Nash correctly argues that in order to request CALJIC No. 8.73 no evidence needed to be presented that Nash's reaction was objectively reasonable, sufficient evidence must have been presented at trial from which a jury reasonably could conclude that the victim committed some provocative act. (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, disapproved on another ground in *People v. Barton, supra*, 12 Cal.4th at p. 200 [there must be evidence from which a reasonable jury could conclude that the defendant "formed the intent to kill as a direct response to . . . provocation and . . . acted immediately."].) As discussed above in section (I)(A)(2), no such evidence was presented at trial and therefore substantial evidence did not support giving CALJIC No. 8.73.

Moreover, the court instructed the court on both first and second degree murder as well as CALJIC No. 8.20, which indicates that to find first degree murder, the jury must find that the killing was preceded by a clear, deliberate intent to kill, "which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion or other condition precluding the idea of deliberation.*" (Italics added.) In *Steele*, the Supreme Court concluded that the same instruction was sufficient with respect to provocation, because "[a]lthough the court did not use the word 'provocation' in regard to the degree of murder, it did instruct on 'heat of passion.' It told the jury that for the killing to be first degree murder, it must not have been committed 'under a sudden heat of passion or other condition precluding the idea of

16

deliberation.' (CALJIC No. 8.20.) By specifically referring to heat of passion and generally referring to any other condition precluding deliberation, the court fully instructed on the law relevant to the actual evidence. It did not also have to refer to 'provocation' regarding the degree of murder, which would not have fit the evidence." (*Steele, supra,* 27 Cal.4th at p. 1251; see also *People v. Chatman* (2006) 38 Cal.4th 344, 392 [error in failing to give lesser included offense instruction is necessarily harmless when jury necessarily decides the factual question posed by the omitted instructions adversely to defendant under other properly given instructions].) Similarly, here, a pinpoint instruction regarding provocation would not have fit the evidence.

In sum, defense counsel's failure to request CALJIC No. 8.73 did not constitute ineffective assistance of counsel.


II.    *Sentencing*

A.  *Use of Multiple-Murder Special Circumstance to Impose Two LWOP Sentences*

Nash argues that he was improperly convicted of more than one multiple-murder special circumstance pursuant to section 190.2, subdivision (a)(3). If a defendant is found guilty of a count of first degree murder, and in the same proceeding the defendant is convicted of more than one offense of first or second degree murder, section 190.2 removes the possibility that the defendant may be sentenced to 25 years to life in prison, and leaves as the only sentencing options death or life in prison without parole (LWOP). (§ 190.2, subd. (a)(3); former § 190, subd. (a).) Based on the jury's finding that this special circumstance was true with respect to each murder count, Nash was sentenced to two consecutive LWOP terms, plus 56 years to life for enhancements. He contends that one of the

two multiple-murder special circumstances findings must be stricken. He further contends that an LWOP sentence may be imposed only once based on the multiple-murder finding and thus we should order the judgment modified to reduce the sentence on one of the murder counts to a term of 25 years to life.

Nash is correct that two multiple-murder special circumstance allegations may not be charged and found true. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422 (*Halvorsen*); *People v. Avena* (1996) 13 Cal.4th 394, 425.) In this case, the special circumstance was charged once with respect to both counts, but the jury found that the special circumstance was true as to each separate count. The remedy is to strike the superfluous finding (*Halvorsen, supra,* 42 Cal.4th at p. 422), and thus we order one of the special circumstances allegations stricken.

As for Nash's contention that his sentence must be modified, he acknowledges that there is contrary authority directly on point, namely *People v. Garnica* (1994) 29 Cal.App.4th 1558 (*Garnica*), in which the appellate court held it was not improper to impose LWOP sentences for each eligible murder based on a multiple-murder special circumstance.[4] (*Id.* at pp. 1563-1564.) In that case, the defendant was found guilty of two counts of first degree murder based on one incident where he shot two victims. (*Id.* at pp. 1559-1560.) The jury found true a multiple-murder special circumstance as to each victim, pursuant to section 190.2, subdivision (a)(3). (*Id.* at p. 1562.) The defendant argued that sentencing him to

---

[4]    As a preliminary matter, we reject respondent's contention that Nash forfeited his challenge to the imposition of two LWOP sentences by failing to object at the time of sentencing. *People v. Scott* (1994) 9 Cal.4th 331, cited by respondent, held that a defendant who fails to object at sentencing forfeits a claim of error on appeal only where his sentence could be permitted by law but it was "imposed in a procedurally or factually flawed manner." (*Id.* at p. 354.) *Scott* confirmed that the forfeiture doctrine does *not* apply where, as here, a defendant contends that the trial court imposed an unauthorized sentence, i.e., a sentence that may not lawfully be imposed under any circumstance in the particular case. (*Id.* at p. 353.)

18

two concurrent LWOP terms violated section 654 because it would constitute impermissible double punishment for the same act, i.e., the act of committing two murders. He asserted that regardless of the number of murders committed, there could be only one multiple-murder special circumstance allegation, and thus there could be only one LWOP sentence. (*Id.* at pp. 1562-1563.)

The appellate court rejected his argument, reasoning as follows: "The multiple-murder special circumstance is a legislative choice to treat as deserving of the most severe punishment a murderer convicted of *more than one* murder. In any one proceeding in which such a finding is made, the fact that a murder is one of multiple murders applies equally to *all* the murders of which the defendant is convicted. *Each* of the murders is deemed the more heinous because it is one of *multiple* killings. We cannot gainsay this legislative determination. [¶] Defendant can take no comfort from those cases holding that, regardless of the number of murders committed, only one multiple-murder special circumstance can be charged. (See, e.g., *People v. Anderson* (1987) 43 Cal.3d 1104, 1150, superseded by statute as stated in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 163, fn. 20; *People v. Hamilton* (1988) 46 Cal.3d 123, 144.) The problem with charging 'multiple' multiple-murder special circumstances, is the 'inflate[d] . . . risk that the jury will arbitrarily impose the death penalty, . . .' (*People v. Harris* [*supra*] 36 Cal.3d [at p. ] 67), because of the sheer number of special circumstances charged and found true. Where the death penalty has not been sought, that concern should not be an issue, and it does not change the fundamental truth that all the murders in a multiple-murder crime spree have been deemed worthy of the ultimate penalty precisely because they are part of a multiple-murder sequence." (*Garnica, supra*, 29 Cal.App.4th at p. 1563.)

The court concluded that "there could be little practical impact or prejudice from imposition of multiple death or LWOP verdicts. In reality, defendant can serve only one such sentence, no matter how many are imposed and no matter whether they are consecutive or concurrent. An LWOP defendant can effectively serve only one life sentence. There are reasons, however, to permit imposition of multiple LWOP sentences. As noted, it has been legislatively determined that multiple murder is especially deserving of the most severe punishment. Neither from a legislative point of view nor from the perspective of the victims' families is there any valid basis upon which to single out any one murder as less deserving of full punishment than the others. Moreover, it is a remote but real possibility that one or another of the sentences might be commuted by the governor. If only one LWOP was imposed and the governor were to commute the sentence on that conviction, Penal Code section 190.2, subdivision (a)(3) should still apply and require a sentence of LWOP on any remaining first degree murder conviction, because there was in fact more than one murder conviction. Yet, the trial court could not thereafter change the sentence to convert the remaining conviction to an LWOP. For these reasons, we hold the trial court is not precluded from imposing either concurrent or consecutive LWOP sentences for each of the first degree murder convictions based on the single multiple-murder special circumstance. This will ensure that a defendant will still serve an LWOP sentence in the unlikely event all but one LWOP should be commuted." (*Garnica, supra*, 29 Cal.App.4th at p. 1564.)

We agree with the *Garnica* court's reasoning and likewise hold that separate LWOP sentences for each murder count based on a multiple-murder special circumstance are permissible. We further reject Nash's contention that *Garnica* is inconsistent with *People v. Jones* (1991) 53 Cal.3d 1115 (*Jones*) and *People v.*

20

*Danks* (2004) 32 Cal.4th 269 (*Danks*), in which the Supreme Court found that duplicative use of multiple-murder special circumstances "'artificially inflates the seriousness of the defendant's conduct.'" (*Danks, supra,* 32 Cal.4th at p. 315, quoting *Jones, supra,* 53 Cal.3d at p. 1148.) Both *Danks* and *Jones* were death penalty cases, where there is a risk that the penalty jury will arbitrarily impose the death penalty based on the number of special circumstances found true in the guilt phase. The holdings of these decisions are not so broad as to prohibit the reliance on a multiple-murder special circumstance in a non-capital case to impose LWOP sentences as to more than one murder count.

Therefore, the trial court did not err in sentencing Nash to separate, consecutive LWOP sentences for each murder conviction, based on the single multiple-murder special circumstance permitted to be charged. (*Garnica, supra*, 29 Cal.App.4th at pp. 1562-1564.)

B. *Sentencing Enhancements Under Section 12022.53, Subdivision (d)*

The trial court sentenced Nash to additional terms of 25 years to life for each murder count under section 12022.53, subdivision (d), a sentencing enhancement applicable where the defendant discharged a firearm causing great bodily injury and death. Nash contends that because he was convicted of murder for the shootings of Wynn and Eleby, the application of this sentencing enhancement violates California's multiple conviction rule based on lesser offenses, as well as federal double jeopardy principles. Nash acknowledges that the California Supreme Court has ruled to the contrary in *People v. Sloan* (2007) 42 Cal.4th 110, *People v. Izaguirre* (2007) 42 Cal.4th 126, and *People v. Palacios* (2007) 41 Cal.4th 720, 725, but he contends that those cases are "in conflict with principles of double jeopardy" discussed in *Apprendi v. New Jersey* (2000) 530 U.S. 466.

21

However, as Nash acknowledges, we are bound by the decisions in *Sloan*, *Izaguirre*, and *Palacios*, and thus we may find no error in the application of section 12022.53, subdivision (d).

    C.  *Parole Revocation Fine*

Nash argues, and respondent concedes, that the judgment must be modified to strike the $10,000 parole revocation fine that was imposed and suspended pursuant to section 1202.45.  "'When there is no parole eligibility, the [parole eligibility] fine is clearly not applicable.'  [Citations.]"  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184.)  Because Nash was sentenced to two LWOP sentences, he is not eligible for parole, and the parole revocation fine must be stricken.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 380.)

## DISPOSITION

The judgment is modified to reflect the striking of one multiple-murder special circumstance finding by the jury as well as the parole revocation restitution fine imposed pursuant to section 1202.45. The clerk of the superior court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



SUZUKAWA, J.


23