Filed 11/15/13  P. v. Sambrano CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054725 |
| v. | (Super.Ct.No. INF051722) |
| JESSIE ESPINOZA SAMBRANO et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  James S. Hawkins, Judge.
Affirmed as modified.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and
Appellant Jessie Espinoza Sambrano.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and
Appellant Anthony Castro Lares.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

Jessie Espinosa Sambrano and Anthony Castro Lares, defendants and appellants, appeal from the judgment entered after a jury found them both guilty of first degree murder (Pen. Code, § 187, subd. (a); count 1),[1] six counts of attempted murder (§§ 664, 187, subd. (a); counts 3, 4, 8, 9, 10, & 11); one count of discharging a firearm at a dwelling house (§ 246; count 5); and two counts of assault with a firearm (§ 245, subd. (a)(2); counts 6 & 7).[2]  In connection with count 1, the jury found true the special circumstance allegation that defendants committed the murder by means of a drive-by shooting within the meaning of section 190.2, subdivision (a)(21).  In connection with all the counts, the jury also made true findings on section 12022.53 firearms use allegations and section 186.22, subdivision (b) criminal street gang allegations.  The jury also found true great bodily injury enhancements under sections 12022.7 and 12022.55 alleged in connection with counts 3, 4, 6, and 7.

In the penalty phase of the trial, the jury rejected death, and found life in prison without the possibility of parole was the appropriate sentence for both defendants.  The trial court sentenced defendants, accordingly, on count 1.  After sentencing defendants on the remaining counts and imposing the various enhancements, the details of which we

---

[1]  All statutory references are to the Penal Code unless indicated otherwise.

[2]  The trial court dismissed count 2, which alleged an alternate first degree murder charge, in the interests of justice.

recount below in our discussion of defendants' claims of sentencing error, the trial court sentenced Sambrano to serve life in prison without the possibility of parole, plus three consecutive terms of 25 years to life, plus six consecutive terms of 15 years to life, plus 80 years. The trial court sentenced Lares to serve life in prison without the possibility of parole, plus three consecutive terms of 25 years to life, plus six consecutive terms of 15 years to life, plus 90 years.

Defendants individually and jointly raise numerous claims of error in this appeal. We recount the details, below, in our discussion of those claims. We agree with defendant Lares's claim the evidence is insufficient to support the true findings on the section 12022.7 and section 12022.55 enhancements alleged in connection with counts 4 and 7. We also agree with both defendants' claim the trial court should have stayed the gang enhancement imposed on counts 3, 4, 8, 9, 10, and 11. Except for those sentencing errors, defendants' remaining claims lack merit. Therefore, we will modify the judgments to reflect the corrected sentences, and as modified, we will affirm.

## SUMMARY OF FACTS

What happened in this case is not in dispute.[3] On August 12, 2005, defendants and codefendant Daniel Torres,[4] all alleged members or associates of a Coachella gang called Varrio Coachella Rifa 52 (VCR), drove into the territory of a rival gang in Indio.

---

[3] Because the facts are undisputed, we take the pertinent factual details from the parties' respective briefs.

[4] Although charged with Sambrano and Lares, the trial court granted Torres's motion for a separate trial.

Defendant Sambrano drove the car even though it belonged to defendant Lares.  Torres was the front passenger, and defendant Lares was in the backseat.  After driving at least twice past a group of people gathered outside a house on Ruby Street, defendant Lares and Torres opened fire.  Defendant Lares by his own admission fired at least 10 rounds from his .30-caliber M1 carbine rifle; Torres fired an unknown number of shots from a .22-caliber handgun that held five rounds.  Their shots killed 19-year-old Vanessa Torres, and seriously wounded Jacob Rodriquez and Jesus Morin, all of whom were outside the house at the time of the shooting.

The issue at trial was why the shooting occurred.  The prosecutor's theory was that the shooting was gang related, specifically that defendants and Torres were retaliating for a rival Indio gang's graffiti in VCR territory, near the home of defendant Sambrano's godmother.  The prosecutor presented photos that depicted the purportedly offending graffiti, and testimony from its gang expert, District Attorney Investigator Charles Cervello, regarding, among other things, the significance of gang graffiti, in general, and in particular the significance of one gang leaving their own graffiti in the territory of a rival.  In this case, the rival gang, North Side Indio (NSI), not only left graffiti in VCR territory, but also obliterated VCR's own gang graffiti.  Investigator Cervello expressed the opinion that NSI's act would be viewed by VCR as disrespect, and in his view "everything" gang members do is about respect.  Gang members do the things they do in order to achieve respect.  Investigator Cervello testified that when a gang member is disrespected, he must retaliate with violence.  Failure to do so diminishes the status of

4

both the gang and the member. In his opinion, defendants committed the crimes in this case for the benefit of, in association with and in furtherance of VCR.

Defendants, on the other hand, initially denied involvement in the shooting. Ultimately, they both admitted their involvement to the investigating law enforcement officers. Defendant Lares claimed they had been looking for a girl he knew who lived somewhere in the neighborhood when they passed by the gathering in front of the Ruby Street house. When they drove by a second time, Torres apparently fired at the group. Defendant Lares testified at trial that he was hallucinating as a result of the various substances he had ingested and thought shots had been fired at them from the group outside the house. Defendant Lares told the investigating police officer that he heard gunshots and fired back with the M1 rifle he kept in the trunk of the car for protection.[5] Following his arrest, defendant Lares admitted he fired more than 10 rounds from his M1 carbine rifle. Defendant Sambrano told law enforcement officers that he did not know his companions had guns when he drove them to Indio to look for a girl who knew about a party.[6] He drove because defendant Lares had taken Ecstasy, smoked marijuana, and had a few beers; he was too impaired to drive. Defendant Sambrano claimed he drove past the house at least once, turned the car around and drove back to see if the girl they were looking for was one of the people outside the house. He was just pulling up to the

---

[5] Defendant Lares said he got the gun from the trunk by putting down one of the backseats as they drove down the street.

[6] Sambrano told the investigating police officer that Torres told him he had a gun while they were driving to Indio.

curb in front of the house, and about to park the car when he heard seven or eight gunshots, after which defendant Lares opened fire from the backseat. Defendant Sambrano immediately pulled away from the curb and drove off.

The Rodriquez family lived in the house on Ruby Street where the shooting occurred. Jacob Rodriguez and his girlfriend, Vanessa Torres (no relation to codefendant Daniel Torres), had just walked out the front door when the gunfire started. Vanessa was hit by three bullets. The fatal wound was inflicted by a high velocity, medium caliber bullet, such as a .30-caliber bullet, that entered her lower back. Jacob was hit twice, once in the arm and once in the torso, but the bullets were not recovered. He spent several weeks in the hospital recovering from his injuries, which included a shattered forearm that required surgery. Jesus Morin was hit in the left leg. The bullet that eventually worked its way out of his body was .44-caliber, the same caliber as Torres's handgun.

Additional facts pertinent to the issues defendants raise on appeal will be recounted below.

## DISCUSSION

### 1.

### ATTEMPTED MURDER JURY INSTRUCTIONS

Defendants both contend their convictions for attempted murder as alleged in counts 8 through 11 must be reversed because the trial court incorrectly instructed the jury on the so-called kill zone theory of concurrent intent to kill. Under that theory,

6

which we discuss in more detail below, the jury may infer from the fact a person fired a barrage of bullets at a group of people, that the shooter had the specific intent to kill everyone in the group. The trial court not only instructed the jury on that principle but also instructed, over defendants' objection, "A person need not be aware of other victims in the kill zone." Defendants contend the quoted statement is incorrect and the trial court committed reversible error by including it in the jury instructions. We disagree.

**A. Relevant Factual and Procedural Details**

In addition to charging defendants with the attempted murders of Jacob Rodriguez and Jesus Morin, both of whom were actually hit by bullets fired by defendant Lares and Torres, the district attorney charged defendants in counts 8 through 11 with the attempted murders of four people who were not actually hit. The charges are alleged in the alternative to identify both a specific victim, whom the evidence showed was inside the house at the time of the shooting, and an unnamed victim but a member of the group gathered at the house. For example, in count 8, the district attorney charged defendants with the attempted murder of "Peter, a minor, age 11, or a member of the group gathered at 83-062 Ruby Street, Indio, a human being." Counts 9 through 11 included the same allegation as count 8, but identified the victims as Eddie, Tatianna, and Dianna, respectively, all of whom along with Peter had been inside the house at the time of the

7

shooting, "or a member of the group gathered at 83-062 Ruby Street, Indio, a human being."[7]

By his own admission, defendant Lares fired at least 10 rounds from his M1 rifle. The evidence showed that weapon could fire as many as 30 rounds. Torres in turn fired his handgun some unspecified number of times. His weapon, according to the evidence, was capable of firing a total of five rounds. In addition to the bullets that hit the three named victims, the evidence also showed that four bullets from defendant Lares's M1 rifle actually entered the residence and a fifth bullet lodged in the outside wall of the house. At least 10 bullets also hit a car parked in the driveway but because the police only recovered bullet fragments it could not be determined who fired those rounds. The trial court instructed the jury according to CALCRIM No. 600 that, "[t]he intent to kill only requires that a person intend to kill someone, even if the person has no specific target in mind. A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' *A person need not*

---

[7] We assume the quoted phrase is based on obiter dictum in *People v. Stone* (2009) 46 Cal.4th 131, in which the defendant fired a single shot into a crowd of people and was charged with the attempted murder of Joel F., even though the evidence only showed that the defendant intended to kill someone in the group but not a specific person. In holding that a defendant who intends to kill but does not have a specific target can be guilty of attempted murder, the Supreme Court described the allegation regarding Joel F. as "problematic" and suggested "[i]f the defendant is accused of attempted murder of someone, although not necessarily a specific person, it would be sufficient to allege enough facts to give notice of the incident referred to and that the defendant is charged with attempted murder. For example, in this case, it would have been sufficient to allege that defendant committed attempted murder, in that on or about October 21, 2005, he attempted to murder a member of a group of persons gathered together in a parking lot in Lemoore, California." (*Id*. at pp. 141-142.)

8

*be aware of other victims in the 'kill zone.'*  In order to convict the defendant of the attempted murder of Jacob Rodriguez, Jesus Morin, Peter, a minor age 11, Eddie, a minor age 7, Tatiana, a minor age 9 and Dianna Rodriquez, the People must prove that the defendant not only intended to kill a person at the gathering but also either intended to kill Jacob Rodriguez, Jesus Morin, Peter, a minor age 11, Eddie, a minor age 7, Tatiana, a minor age 9 and Dianna Rodriquez or intended to kill everyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to [kill] Jacob Rodriguez, Jesus Morin, Peter, a minor age 11, Eddie, a minor age 7, Tatiana, a minor age 9 and Dianna Rodriquez or intended to kill a person at the gathering by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Jacob Rodriguez, Jesus Morin, Peter, a minor age 11, Eddie, a minor age 7, Tatiana, a minor age 9 and Dianna Rodriquez."[8]

## B.  Analysis

The crime of attempted murder requires the specific intent to kill a human being and a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Stone*, *supra*, 46 Cal.4th at p. 136.)  Therefore, a person who fires a single shot into a crowd of people, intending to kill one of them but not knowing or caring which one, can be convicted of attempted murder.  (*Stone*, at p. 134.)  Moreover, a person who fires

---

[8] The trial court's oral version of the instruction differed from the written version in that the court stated that in order to convict defendants of attempted murder the People must prove "that the defendant intended to kill a person at the gathering, but—but intended to kill Jacob Rodriguez, Jesus Morin, Peter, Eddie, Tatiana, and Diana Rodriguez or intended to kill everyone inside the kill zone."

multiple shots at a group of people can be viewed as having created a kill zone, which constitutes circumstantial evidence of the person's concurrent intent to kill everyone in the group if the number of shots fired equals or exceeds the number of people in the group.  (*People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*).)

The trial court presumably took the language, "A person need not be aware of other victims in the 'kill zone,'" from the section entitled "AUTHORITY" that follows CALCRIM No. 600 in the bound CALCRIM volume.  That section includes the point "Killer Need Not Be Aware of Other Victims in Kill Zone" and cites *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 (*Adams*).  (See CALCRIM No. 600 (2013) p. 369.) The quoted phrase, although a correct statement of law, is not one about which the trial court should instruct the jury, as we now explain.

In *Adams*, *supra*, 169 Cal.App.4th 1009, the defendant set fire to a house.  She was convicted, among other things, of the attempted murders of everyone in the house at the time she set it ablaze.  On appeal, she argued that CALCRIM No. 600 is ambiguous to the extent it permitted the jury to find her guilty of attempted murder even if she was not aware the alleged victims were in the house.  (*Adams*, at pp. 1020-1021.)  In rejecting her argument, our colleagues in the Fifth District discussed *Bland*, in which the California Supreme Court confirmed the doctrine of transferred intent does not apply to attempted murder, it applies only to murder.  "However, the California Supreme Court also recognized that 'a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force

10

designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*Adams*, at p. 1021.)

The Supreme Court in *Bland* described such a defendant as harboring a "concurrent" specific intent to kill everyone within the kill zone, either as an end in itself, or in order to kill a primary or targeted victim. (*Bland*, *supra*, 28 Cal.4th at pp. 330-331.) The court also stated that unlike transferred intent, the concurrent intent theory "is not a legal doctrine requiring special jury instructions." (*Id*. at p. 331, fn. 6.) "Rather it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Ibid*.) In *Adams*, the Fifth District rejected the defendant's argument that in a kill zone situation, attempted murder liability requires knowledge of the victims' presence in the kill zone. "[T]he concurrent intent doctrine permits a rational jury to infer the required express malice [or specific intent to kill] from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm." (*Adams*, *supra*, 169 Cal.App.4th at p. 1023.) It is not a defense that the defendant did not know the victims were present within the zone of harm. (*Ibid*.)

In short the trial court's instruction to the jury in this case is correct, even though it includes the kill zone theory; that so-called theory describes the type of circumstantial evidence that will support an inference the defendant harbored the requisite specific intent to kill everyone within the zone. Because it concerns specific application of the established legal principles pertinent to the sufficiency of circumstantial evidence, the kill

11

zone theory and related concepts are not ones that require special instruction.  Although instruction is not required, it also is not error to give such an instruction.

## 2.

## SUFFICIENCY OF THE EVIDENCE

Defendants raise various claims challenging the sufficiency of the evidence to support the jury's guilty verdicts on various counts and true findings on various special allegations.  We address those claims below.

### A.  Standard of Review

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citations.]  The same standard applies when the conviction rests primarily on circumstantial evidence.  [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

### B.  Analysis

### (1.)  Attempted Murder Convictions

Defendants challenge the sufficiency of the evidence to support the jury's verdicts finding them guilty of attempted murder as alleged in counts 8 through 11, which they contend pertain to victims inside the house.  Defendants argue there was no evidence that

12

showed they knew anyone was in the house at the time defendant Lares and Torres fired their respective weapons; therefore, the evidence was insufficient to show they had the specific intent to kill anyone in the house. Relying on the claim they must know of a victim's presence in order to be guilty of attempted murder, defendants contend the evidence did not show they knew people were in the house, and therefore they cannot be guilty of the corresponding attempted murders. We disagree.

Defendant's liability for the attempted murder of people in the house turns on the evidence regarding the manner in which defendants committed their crimes. As the *Adams* court put it, the means employed to accomplish the crime are what distinguish "attempted murder under a concurrent intent theory from 'normal' attempted murder." (*Adams*, *supra*, 169 Cal.App.4th at p. 1022; see also *People v. McCloud* (2012) 211 Cal.App.4th 788 [defendant who fired 10 shots into a large group of people, killing two, could only be charged with attempting to murder eight, not all 46 people in the group].) Here, the evidence presented at trial (and recounted above) shows defendant Lares admitted to firing an assault type weapon that held 30 rounds capable of piercing walls. Torres fired a .44-caliber handgun that held five rounds. The evidence shows three rounds hit Vanessa Torres, two hit Jacob, one hit Jesus, five hit the house, and at least nine bullets hit Jacob's car, which was parked in the driveway. Therefore the evidence

13

shows defendants fired no less than 18 and as many as 35 rounds at the group and the house.[9]

From the fact they fired between 18 and 35 rounds, numbers that exceed the total number of potential victims, and they hit three people, killing one and injuring the other two, the jury could reasonably infer defendants had the specific intent to kill everyone inside and outside the house. The fact that defendants missed their marks and did not actually hit everyone does not compel us to find the evidence insufficient to support the jury's implied findings that defendants had the specific intent to kill everyone in the group. The fact that the house was not riddled with bullet holes and that some bullets hit the structure near the roof or ceiling and therefore could not have killed anyone also does not compel a finding that defendants lacked the necessary specific intent.

We base our conclusion, in part, on *People v. Vang* (2001) 87 Cal.App.4th 554, in which the defendants, as they drove by in a car, fired an AK series rifle and a shotgun more than 50 times into both units of a duplex. A short time later they drove by an apartment complex where they used the same assault rifle to spray bullets into a specific apartment unit. (*Id*. at p. 558.) In affirming the defendants' convictions on 11 counts of attempted murder based on the total number of occupants present in both housing units when defendants fired their weapons, the appellate court stated, "The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to

_____

[9] As the prosecutor put it in his closing argument, "Who knows the number of shots defendants actually fired at the crowd outside and in the house." In the prosecutor's view, the evidence showed defendants intended to kill everyone both inside and outside the house.

14

those victims who were present and in harm's way, but fortuitously were not killed."
(*Id*. at p. 564.)

Moreover, this is not a so-called kill zone case. In our view, that phrase applies when the district attorney charges the defendants with attempting to kill an entire group of people the defendant put in danger as a result of the defendant's act, of say, setting a house on fire as in *Adams*, *supra*, 169 Cal.App.4th 1009. In this case, the district attorney did not charge defendants with attempting to kill everyone present. The district attorney charged defendants with killing one person and attempting to kill six others. The jury could reasonably infer from the above noted evidence that defendants intended to kill someone with each round fired, and therefore the evidence supports the jury's verdicts on all the attempted murder charges.

### (2.) Gang Enhancements

The district attorney alleged so-called gang sentence enhancements under section 186.22, subdivision (b) in connection with each of the 11 crimes charged against defendants in the second amended information. In order to prove the enhancements, the prosecutor had to present evidence to show, among other things, that VCR is a criminal street gang. Section 186.22 defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of [specified felonies including, assault with a deadly weapon, possession of controlled substances for sale, burglary, and auto theft], having a common name or common identifying sign or symbol, and whose members

15

individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subds. (f), (e)(1), (4), (11), (25).)

Defendants challenge the sufficiency of the evidence to prove one of the primary activities of VCR is the commission of one or more of the enumerated crimes. We conclude the evidence is sufficient to support that implied finding.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining 'primary'].) That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*People v.*] *Gardeley* [(1997)] 14 Cal.4th 605. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. [Citation.]" (*Id.* at p. 324.)

16

In this case, the prosecutor presented the testimony of Investigator Cervello, an undisputed gang expert, to prove the primary activities of VCR. The prosecutor asked Investigator Cervello, "Okay. What is the primary activity of Varrio Coachella Rifa criminal street gang? By this I mean can you tell me the activities the gang engages in consistently and repeatedly as their chief or principle occupation?" Investigator Cervello responded, "In my opinion, those activities include shootings, fights, stabbings, homicides, drug sales, all the way down to stealing cars and doing robberies."

Defendants contend shootings, fights, stabbings, homicides, and drug sales are not among the crimes specified in section 186.22, subdivision (e); only car theft and robbery are included in the list of qualifying offenses. Moreover, they note the trial court instructed the jury, in pertinent part, in order to be a criminal street gang, that one or more of the primary activities must be "the commission of murder, attempted murder, assault with a deadly weapon, robbery, and burglary." Of the crimes the trial court included in the jury instruction, defendants point out only robbery is also included in Investigator Cervello's list of VCR's primary activities.

Defendants contend Investigator Cervello did not testify that robbery was a primary activity of VCR. Instead, he recited seven activities in response to the prosecutor asking what is *the* primary activity of VCR. Because Investigator Cervello cited seven activities, defendants assert the jury could only conclude all seven collectively constitute the primary activity of VCR; the jury could not logically infer that each activity individually is the primary activity. Defendants argue, in order to draw such an

17

inference, the jury would have to engage in the fallacy of division, i.e., assume what is true for the whole is also true for its individual parts.

Defendants' argument assumes the jury ignored the second half of the prosecutor's question, which as quoted above, asked Investigator Cervello to identify the "activities" in which the gang consistently and repeatedly engages as their chief or principle occupation. Although not evidence, the wording of counsel's questions may be important to understanding the witness's response. (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 107 ["Often it is vital to consider the question to understand *anything* about the answer, as with answers like 'yes'"].) In short, when considered in the context of the prosecutor's entire question, it is apparent Investigator Cervello's response identified various primary activities of VCR, including robbery.

Defendants also contend Investigator Cervello's conclusory opinion regarding the primary activities of VCR does not constitute sufficient evidence to support the jury's implied finding that VCR is a criminal street gang. Defendants' argument is based on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), in which the gang expert, when asked to describe the primary activities of the gang at issue in that case, responded, "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) Noting the quoted testimony was the only evidence on the issue, and that the expert did not offer specific details, nor did he "directly testify that criminal activities constituted [the gang's] primary activities" (*id.* at p. 612), and in any event the testimony lacked an

18

adequate foundation, the court held that the evidence was insufficient to prove the gang in that case was a criminal street gang within the meaning of section 186.22. (*Id.* at pp. 613–614.)

In this case, Investigator Cervello, the supervisor of the district attorney's gang unit, testified as the prosecutor's gang expert. He was a member of two multi-agency gang task forces, the Coachella Valley Violent Crime Gang Task Force of which he was a founding member, and the FBI's Gang Impact Team, a team he and an FBI agent formed. He had investigated gang-related crimes, including 200 homicide investigations, and between 800 and 900 violent crimes, most of them gang related. Investigator Cervello testified that he had spoken with more than 1,000 gang members, including former and current VCR members. In addition he had spoken to other officers about VCR. As a result of his personal experience and talking with other officers, he knew VCR's signs, symbols, turf, and number of members. That testimony not only is sufficient to establish the primary activities of VCR, but it also reveals the basis for Investigator Cervello's opinion, and thereby distinguishes this case from *Alexander L.*, *supra*, 149 Cal.App.4th 605.

The evidence in this case is akin to that in *People v. Martinez* (2008) 158 Cal.App.4th 1324, in which two of the three justices who had earlier decided *In re Alexander L.* held that the expert's direct testimony regarding the primary activities of the gang, combined with his testimony regarding his experience investigating gang crimes, which included personal conversations with gang members and reviews of reports, was

sufficient to establish the foundation for the expert's opinion, and thus to prove the primary activity of the gang.  (*People v. Martinez*, at pp. 1329–1330.)

### (3.)  Great Bodily Injury Enhancements

Defendant Lares contends the evidence is insufficient to support the jury's true findings on the great bodily injury enhancements under sections 12022.7 and 12022.55 alleged in connection with counts 3, 4, 6, and 7, which pertain respectively to the attempted murder of and assault with a deadly weapon on Jacob Rodriguez and Jesus Morin.  We agree with respect to counts 4 and 7 in which Jesus Morin is the alleged victim.

Both section 12022.7 and section 12022.55 require proof a defendant personally inflicted great bodily injury, the former in the commission of a felony, and the latter by discharging a firearm from a motor vehicle.[10]  The evidence is undisputed that Jesus Morin was hit and wounded by a .44-caliber bullet, and that Torres fired the .44-caliber handgun.  The Attorney General appropriately concedes the evidence does not prove Lares personally inflicted great bodily injury on Jesus Morin.  Therefore, the evidence does not support the jury's true findings with respect to Lares on the section 12022.7 and section 12022.55 enhancements alleged in connection with counts 4 and 7, in which Jesus Morin is the alleged victim.

---

[10]  Section 12022.7 creates a three-year sentence enhancement for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony. . . ."  Section 12022.55 provides for a sentence enhancement of five, six, or 10 years "when the defendant personally inflicts great bodily injury or death by discharging a firearm from a motor vehicle."  (*People v. Myers* (1997) 59 Cal.App.4th 1523, 1532.)

20

With respect to Jacob Rodriguez, Lares contends the evidence is insufficient to prove he personally inflicted the great bodily injury caused by the two bullets that entered and exited Rodriguez's body, one of which shattered his forearm, because there was no evidence presented at trial to prove who fired the bullets that caused those injuries. We disagree.

According to the evidence presented at trial, the bullets that hit Rodriguez were not recovered and the prosecutor did not offer any other evidence to show whether defendant Lares or Torres or both fired the rounds that hit Rodriguez and caused him great bodily injury. Defendant Lares acknowledges the principle set out *In re Sergio R.* (1991) 228 Cal.App.3d 588 (*Sergio R.*), that "where, as here, more than one assailant discharges a firearm into a group of people and 'it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered.' [Citation.]" (*Id.* at pp. 601-602.)

The Supreme Court in *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*) did not implicitly overrule *Sergio R.*, *supra*, 228 Cal.App.3d 588, as defendant Lares contends. In fact, it did just the opposite; the court implicitly affirmed the holding by citing it as an example of cases in which courts have found the evidence sufficient to support a jury's personal infliction finding in the context of a group assault, or what is commonly referred to as a group beating. (*Modiri*, at p. 496.)

21

Defendant Lares also contends even if it is "good law," *Sergio R.*, *supra*, 228 Cal.App.3d 588, is distinguishable because in that case both defendants fired the same type of weapon (a 12-gauge shotgun) into a group of people, and therefore it was impossible to determine which defendant fired the bullets that hit the victims. In this case defendant Lares contends the prosecutor could have presented evidence other than the actual bullet to prove defendant Lares fired the rounds that hit Jacob Rodriguez. For example, he notes the pathologist was able to determine from the nature of the injury that a medium caliber bullet, like the ones Lares fired from his M1 rifle, killed Vanessa Torres. Therefore, he contends similar evidence should have been presented regarding the injuries Rodriguez sustained. In other words, defendant Lares is of the view the prosecutor must show it was not possible to prove which bullet hit the victim before the prosecution may rely on the group beating principle. We disagree.

When the victim of a crime dies as a result of that crime, an autopsy generally is performed. That procedure includes forensic analysis of the fatal wound, as in this case. That analysis, in turn, enables an expert witness to express an opinion regarding the cause of death. In contrast, when a victim is seriously injured in an assault, the victim ordinarily receives medical care from a medical practitioner, most likely a physician. When the injury consists of a bullet wound but the bullet is not recovered, as in this case, the treating physician might not have the training or expertise necessary to estimate the size of the bullet that inflicted the wound. Other evidence, such as photographs of the wound, might not have been taken, or if taken might be inadequate to enable a physician trained in forensic medicine to make the necessary determination or at least express an

22

opinion regarding the size of the bullet that caused the injury. In our view, the defendant may rely on the absence of such evidence to create a reasonable doubt about the truth of the great bodily injury allegation. But if the jury returns a true finding on allegations the defendant personally inflicted great bodily injury, we will conclude the evidence is sufficient to support the finding if it shows the defendant was one of two or more people who participated in an attack on the victim in which the "defendant personally applied physical force to the victim either (1) of a nature that, 'by itself,' could have caused great bodily injury, or (2) under such circumstances that the 'cumulative effect' of the force used by all participants would have caused the injury. [Citations.]" (*Modiri*, *supra*, 39 Cal.4th at pp. 485-486.)

Here the evidence shows defendant Lares was one of two people who fired multiple rounds at a house and at the group of people gathered in the front yard of the house. Jacob Rodriguez was one of the people in the front yard and he was hit by two bullets. That evidence supports the jury's implied finding that defendant Lares participated in an attack on Rodriquez by applying physical force on him of a nature that by itself could have caused great bodily injury to Rodriguez. Accordingly we conclude the evidence is sufficient to support the jury's true findings with respect to defendant Lares on the section 12022.7 and section 12022.55 enhancements on counts 3 and 6, in which Jacob Rodriguez is the alleged victim.

23

**3.**

**ADMISSIBILITY OF REBUTTAL TESTIMONY FROM**

**MEXICAN MAFIA MEMBER**

Defendant Sambrano contends the trial court committed prejudicial error by allowing the prosecutor, over defendants' various objections, to call Rene Enriquez as a rebuttal witness. Enriquez is a former Mexican Mafia member and the subject of a book. (See Blatchford, The Black Hand (2008).) Defendant Sambrano contends Enriquez's testimony was not proper rebuttal, and that in any event it was irrelevant, and at the very least its probative value was substantially outweighed by its potential for prejudice. Therefore, he contends the trial court committed prejudicial error by allowing the prosecutor to present that testimony at trial. We disagree. But even if we were to agree, we would conclude, as we explain below, the error was not prejudicial.

**A. Relevant Facts**

In his defense, defendant Sambrano testified in pertinent part that the shooting was not gang related and was not a drive-by shooting based on his understanding of what constitutes a drive-by shooting. As further support for their claim the shootings were not related to their gang memberships and affiliations, defendant Sambrano testified that when he was first arrested in this case, a "green light" had been issued against him but it was later recalled. Defendant Sambrano explained that a moratorium had been called on drive-by shootings. Any gang member who violated that moratorium was subject to a green light, which means other gang members have the "green light" to beat up the violator. Defendant Sambrano testified a green light had been issued and he was getting

24

beaten up in jail, until he asked the shot caller in jail to investigate the shooting. Defendant Sambrano explained to the shot caller that the shooting was not a drive-by shooting. Defendant Sambrano testified he later learned the green light had been recalled.

During a break while defendant Sambrano was on the stand, the district attorney announced he intended to call Rene Enriquez as a rebuttal witness. Enriquez is a former Mexican Mafia member, serving multiple life terms in prison, and as previously noted is the subject of a book entitled The Black Hand. Although still in prison, Enriquez disavowed the Mexican Mafia, and has cooperated with state and federal law enforcement agencies. He claims, among other things, to be a certified expert on the Mexican Mafia.

In an Evidence Code section 402 hearing, the prosecutor represented to the court Enriquez would "talk about prison gangs and street gangs and interaction and the control. Green lights, how green lights happen. Drive-bys, definitions of drive-bys, moratoriums [*sic*]. How he was part of moratoriums [*sic*]. How Southern California gangs react under the guidelines from the Mexican Mafia. And how they're controlled, what you can expect from gang members, what they participate in, what's directed to, and what they need to do under the guidelines from the Mexican Mafia, and the control that's exerted upon Southern California street gangs."

Defense counsel objected that Enriquez's proposed testimony would be cumulative to the testimony of the prosecutor's gang expert, Investigator Cervello, and in any event was not proper rebuttal evidence because defendant Sambrano only testified

25

based on his knowledge and experience as a member of VCR, and not as a purported expert on criminal street gangs in general. In addition defense counsel objected under Evidence Code section 352 that the probative value of Enriquez's testimony was substantially outweighed by its potential for prejudice. The trial court overruled defendants' objections.

As a result, Enriquez testified, purportedly in rebuttal to defendant Sambrano's testimony, about his life as a member of Arta, a so-called Hispanic gang in the Artesia area of Los Angeles County that Enriquez joined when he was 12 years old. In telling what effectively amounted to his life story, Enriquez recounted what he described as the "unquantifiable" number of crimes he committed as a member of that gang. Enriquez also testified that he became a Mexican Mafia member in prison. He recounted the history of the Mexican Mafia, his role in the upper ranks of that prison gang, and the role the Mexican Mafia purportedly plays in controlling all so-called sureño gangs, i.e., Hispanic gangs in Southern California. Enriquez also explained the moratorium on drive-by shootings imposed by the Mexican Mafia, the significance of a green light, the term used to describe punishment imposed when a member of a Hispanic gang violates Mexican Mafia guidelines, and how a green light can be recalled or cancelled.

Enriquez also testified as an expert on gangs and gang culture, in general. He stated among other things gang members travelling together in a car will know if one of them is carrying a gun because it is status to carry a gun. He also stated that in his experience it is not common for members of one gang to go to a rival gang's party unless

26

the objective is to commit a violent act.[11] Enriquez explained the significance of tagging and gang graffiti; gang challenges, such as the phrase "¿Qué honda?" ("What's up?"); and gang hand signs.

### B. Discussion

"The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1199.) "Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial. [Citations.]" (*Ibid.*)

We cannot say the trial court abused its discretion in this case, even though we view Enriquez's rebuttal testimony as akin to using a sledge hammer to secure a thumb tack. Most of Enriquez's testimony was not relevant to any issue at trial in this case. For example, whether defendants' conduct constituted a drive-by shooting according to the Mexican Mafia's definition was irrelevant. Moreover, we agree with defendants that Enriquez's lengthy narrative about his street gang experience which was 30 years out of

---

[11] Defendant Sambrano objected on the ground of relevance to this specific question because by his own admission Enriquez's experience as a gang member was in Los Angeles, and occurred 30 years before the events in this case, which took place in the Coachella Valley. The trial court overruled that objection.

date, and involved a different gang, located in an entirely different geographic area than the gangs at issue in this case was irrelevant.

However, for that same reason, i.e., because it was only marginally relevant, even if we were to conclude the trial court abused its discretion by allowing Enriquez to testify, we nevertheless would conclude the error was harmless in this case. Investigator Cervello addressed nearly all of the things about which Enriquez testified, including whether it was likely defendants would attend a party in a rival gang's territory, whether gang members driving around together would know who was armed, the significance of gang graffiti, gang challenges, the moratorium on drive-by shootings, and other details of gang conduct pertinent in this case.

Given the marginal relevance of Enriquez's testimony, we conclude it is not reasonably probable the jury would have believed defendants' explanation that they were just out looking for some girls and the shooting was a complete accident, unrelated to their gang participation, if Enriquez had not testified at trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

**4.**

**JURY'S VIEW OF CRIME SCENE**

Defendants contend the trial court committed error when it failed to obtain their personal waivers of their statutory right to be present when the jury viewed the crime scene. We disagree.

Their contrary suggestion notwithstanding, defendants were present when the jury viewed the crime scene. They had been driven to the crime scene view but, in

accordance with the agreement of their respective attorneys, defendants did not get out of the vehicle. Because they were present, defendants effectively contend they had a right not only to be present but also to get out of the vehicle and walk around with the jurors while the jurors viewed the crime scene. Defendants do not cite any authority to support such a claim.

Moreover, even if we were to agree with defendants, the trial court's failure to obtain their personal waivers of their purported right was not prejudicial. The right to be present during a jury's viewing of a crime scene is statutory not constitutional. (*People v. Moon* (2005) 37 Cal.4th 1, 20.) Therefore, any purported error requires reversal only if it is reasonably probable the jury would have reached a result more favorable to defendants if the error had not occurred. (*Id*. at p. 21.)

Defendants cannot demonstrate prejudice. Defendants contend the close-up view of the crime scene apparently persuaded some or all of the jurors to find defendants guilty.[12] Defendants contend if they had been allowed to get out of the car, they might have noticed the jurors' reactions to the crime scene view, and could have advised their attorneys to take a different approach at trial. Defendants' argument assumes the jurors displayed visible reactions while viewing the crime scene, that defendants could not see the jurors from their vantage point inside the vehicle, and that their attorneys, who were

_____

[12] Apparently, the house and yard where the shooting occurred are small, and the distance from the street to the yard is quite short. These facts enabled Lares's attorney to argue in closing that given the short distance from the street to the people and the house, if Lares had intended to kill everyone, he could easily have done that; how could he miss?

29

walking around with the jurors,[13] would not or could not notice if any jurors displayed negative reactions. In short, defendants' prejudice claim is based entirely on speculation.

Because defendants have not demonstrated the violation of any right, or resulting prejudice, assuming a right exists, we conclude their claim is meritless.

## 5.

## JUROR IDENTIFYING INFORMATION

Defendant Sambrano contends the trial court committed prejudicial error by denying his motion to disclose juror identifying information. We disagree.

### A. Relevant Facts

The pertinent facts are that defendant Sambrano filed a petition to disclose the identity of the jurors after a female juror sent him a letter expressing her remorse for convicting him of murder. In the letter, which defendant appended as an exhibit to his motion, Juror No. 2 stated, in pertinent part, that she fought for defendant Sambrano during deliberations, telling the other jurors that he was not a murderer but the other jurors told her she had to follow the law. She followed the law, and now was having a very hard time because in her eyes he was not a murderer; he drove the car but he did not fire the gun that killed the girl.

The trial court summarily denied defendant Sambrano's motion, because he failed to establish a prima facie showing of good cause to release the juror information.

---

[13] Because their attorneys were present, *People v. Garcia* (2005) 36 Cal.4th 777, which defendants cite to support their claim, is distinguishable. In that case both the attorney and the defendant were barred from the jury's return visit to the crime scene. (*Id*. at p. 807.)

30

## B.  Analysis

After the jury's verdict is recorded in a criminal case, personal identifying information about the jurors who served on the trial is sealed.  (Code Civ. Proc., § 237, subd. (a)(2).)  A defendant or the defendant's attorney may request access to that information in order to "communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."  (Code Civ. Proc., § 206, subd. (g).)  The procedure for obtaining that information is set out in Code of Civil Procedure section 237, subdivision (b):  "Any person may petition the court for access to these records.  The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.  The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information . . . ."  On appeal, we review a trial court's denial of a petition to disclose juror identifying information for abuse of discretion.  (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

The juror's letter to defendant Sambrano does not establish good cause to release juror identifying information.  The letter discloses only that the juror was persuaded to follow the law, which includes liability based on aiding and abetting, even though she did not agree with that legal principle.  Defendant Sambrano's showing does not establish a basis for releasing juror identifying information.  The trial court did not abuse its discretion by denying his petition.

31

**6.**

**IMPERFECT SELF-DEFENSE INSTRUCTION**

Defendant Lares contends the trial court should have instructed the jury that an honest belief based on a psychotic delusion or hallucination, even if objectively unreasonable, negates malice such that the resulting homicide, or attempted homicide, is voluntary manslaughter.  We disagree.

**A.  Relevant Facts**

During the discussion of jury instructions, defendant Lares's attorney asked the trial court to give CALCRIM No. 627 on the effect hallucination has on premeditation. The trial court questioned whether the instruction on imperfect self-defense should also be linked to the hallucination instruction.  The trial court then answered its own question by citing *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446:  "'Imperfect self-defense cannot be based on hallucinations or delusions untethered to reality.  The defense must be based on [an] honest, albeit wrong and negligent view of reality.'"  Lares's attorney agreed, "You can't hallucinate, be voluntarily intoxicated, and then have an imperfect self-defense."

The trial court instructed the jury on first degree murder based on premeditation and deliberation and shooting from a vehicle, second degree murder, attempted premeditated murder, voluntary manslaughter, attempted voluntary manslaughter based on both heat of passion and imperfect self-defense, involuntary manslaughter, self-defense, mistake of fact, and voluntary intoxication.  The trial court also instructed the jury according to CALCRIM No. 627 that the jurors could consider evidence of

32

hallucinations, if any, in deciding whether defendant acted with premeditation and deliberation.

## B. Analysis

Defendant Lares contends the trial court should have instructed the jury in this case on imperfect self-defense based on a delusional belief in the need to defend himself. There are numerous reasons why we disagree with defendant Lares, the first of which is that he did not request that instruction. In fact, as noted above, his attorney agreed that such an instruction would be incorrect. By his concurrence, defendant Lares's attorney effectively invited the error about which he now complains on appeal. (*People v. Wickersham* (1982) 32 Cal.3d 307, 330 ["If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal"].)

Because defendant Lares did not request the instruction, the only other basis upon which the trial court can be faulted for failing to instruct is that it had a sua sponte duty to do so. "In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085, citing *People v. Breverman* (1998) 19 Cal.4th 142, 154.)

Defendant Lares acknowledges the pertinent legal principle, set out in *People v. Mejia-Linares*, *supra*, 135 Cal.App.4th 1437, that imperfect self-defense may not be based on delusion or hallucination. However, the issue of whether the defendant's belief may be based on a psychotic delusion is currently pending before the Supreme Court in *People v. Elmore*, review granted February 2, 2011, S188238.

In short, the trial court correctly instructed the jury according to the principles of law extant at the time of defendant Lares's trial. Defendant Lares did not request any other instruction, and agreed with the trial court's proposed instructions. Therefore, we conclude his claim regarding instructional error is meritless.

## 7.

## DEFENDANTS' CLAIMS OF SENTENCING ERROR

Both defendants individually and jointly raise claims of sentencing error.

### A.  Minimum Parole Eligibility Term

Both defendants challenge the 15-year minimum parole eligibility term the trial court imposed under section 186.22, subdivision (b)(5) on their convictions for attempted premeditated murder. Defendant Sambrano raises the issue with respect to all six of his attempted murder convictions; defendant Lares raises the issue with respect to counts 8 through 11. The Attorney General concedes the error as to defendant Sambrano but argues with respect to defendant Lares that the evidence supports the enhancement. The issue with respect to both defendants is the same—the prosecutor did not allege and the jury did not find that either defendant personally used or discharged a firearm with respect to the counts in question. Therefore, the trial court should have stayed the minimum parole eligibility term with respect to both defendants, for reasons we now explain.

The pertinent facts with respect to defendant Sambrano are that the jury found him guilty of six counts of attempted premeditated murder—counts 3, 4, 8, 9, 10 and 11. On all six counts the jury returned true findings on the special allegation under section 186.22, subdivision (b)(5) that each of the crimes was committed for the benefit of a criminal street gang. On counts 3 and 4 the jury also made true findings on the allegation under section 12022.53, subdivisions (d) and (e)(1) that a principal personally used a handgun and proximately caused great bodily injury in the commission of those crimes. On counts 8 through 11, the jury made true findings on the special allegation under section 12022.53, subdivisions (c) and (e)(1) that a principal personally used a handgun in the commission of the crimes. The trial court imposed sentence enhancements on each of the six attempted murder convictions under both section 186.22, subdivision (b)(5) and also under the pertinent section 12022.53 gun use enhancement.

Section 12022.53, subdivision (e)(2) precludes imposition of both the gun use and criminal street gang enhancement if the defendant did not personally use or discharge a firearm in the commission of the offense. (§ 12022.53, subd. (e)(2);[14] *People v. Brookfield* (2009) 47 Cal.4th 583, 590.) Because the jury found only that a *principal* personally used a firearm in the commission of the crimes, Sambrano was not subject to both the gun use enhancement and the section 186.22 criminal street gang enhancement. Therefore, the trial court should have stayed the section 186.22, subdivision (b)(5)

---

[14] Subdivision (e)(2) of section 12022.53 provides, "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

35

minimum parole term imposed on each of the attempted murder convictions. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238.) We will direct the judgment be amended accordingly.

We reach the same conclusion with respect to defendant Lares on counts 8 through 11. On those attempted murder counts the district attorney alleged and the jury found true the allegation under section 12022.53, subdivision (c) that a principal personally and intentionally discharged a firearm. The trial court imposed consecutive sentences of life, plus an enhancement under section 12022.53, subdivision (c) of 20 years for discharge of a gun. The trial court also imposed the 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5). Because the district attorney did not allege and the jury did not find defendant Lares personally used and/or discharged a firearm, and instead found only that a principal personally and intentionally used a firearm, defendant Lares was not subject to the enhancement for participation in a criminal street gang in addition to the enhancement imposed under section 12022.53. (*People v. Valenzuela*, *supra*, 199 Cal.App.4th at p. 1238 citing *People v. Brookfield* (2009) 47 Cal.4th 583, 590.) Therefore, the judgment must be modified to stay imposition of the 15-year minimum parole eligibility term set forth in section 186.22, subdivision (b)(5) on counts 8 through 11 with respect to defendant Lares.

## B. Criminal Street Gang Enhancement

The jury found defendant Lares guilty on count 1 of first degree murder in connection with the death of Vanessa Torres, and further found true the special circumstance under section 190.2, subdivision (a)(21), that the murder was intentional and perpetrated by the means of discharging a firearm from a motor vehicle with the intent to inflict death. The jury also found true the criminal street gang allegation under section 186.22, subdivision (b), and the gun use enhancement under section 12022.53, subdivision (d), that defendant Lares intentionally discharged a firearm and proximately caused great bodily injury and death.[15]

After the jury rejected the death penalty in favor of life in prison without the possibility of parole, the trial court sentenced defendant Lares to serve that term, plus a consecutive indeterminate term of 25 years to life on the gun use enhancement under section 12022.53, subdivision (d), and a consecutive determinate term of 10 years on the section 186.22, subdivision (b) criminal street gang enhancement.

Defendant Lares contends because the trial court imposed a life term on count 1, the trial court should have imposed the 15-year minimum parole term rather than the 10-year determinate term on the section 186.22, subdivision (b) criminal street gang enhancement.

---

[15] We do not mention the jury's true findings on other sentence enhancements alleged in connection with count 1 because they are not pertinent to the issues defendant Lares raises in this appeal.

To support his argument, defendant Lares cites *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), in which our state Supreme Court held a defendant who commits a gang-related violent felony punishable by life imprisonment is not subject to the 10-year gang-benefit enhancement under section 186.22, subdivision (b)(1)(C).  Instead, the defendant is subject to a minimum parole eligibility term of 15 years under section 186.22, subdivision (b)(5).[16]  (*Lopez*, at p. 1010.)

In *Lopez*, the defendant was sentenced to a term of 25 years to life for first degree murder (*Lopez*, *supra*, 34 Cal.4th at p. 1005); here, the trial court sentenced defendant Lares to life without the possibility of parole.  Because defendant Lares will never be paroled imposition of the minimum parole term would serve no purpose.  The purpose of sentencing a defendant to additional enhancements, such as the 10-year gang-benefit enhancement, is to protect against the eventuality that the defendant's sentence might one day be reduced on direct appeal or habeas corpus.  (See, e.g., *People v. Garnica* (1994) 29 Cal.App.4th 1558, 1564 [Fourth Dist., Div. Two].)

Moreover, our Supreme Court has twice suggested, albeit in dicta, that the minimum parole eligibility provision was never intended to apply to persons sentenced to life without parole.  In *Lopez*, the Supreme Court examined the history of the Street Terrorism Enforcement and Prevention Act (STEP Act) and noted that a 1988 enrolled bill report which analyzed the financial impact of the provision stated:  ""This proposed

---

[16] "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."  (§ 186.22, subd. (b)(5).)

provision relating to life terms [former section 186.22, subdivision (b)(3), now section 186.22, subdivision (b)(5)] would apply to all lifers (except life without possibility of parole)."'" (*Lopez, supra*, 34 Cal.4th at p. 1010.) The court concluded that, "at the time the STEP Act was enacted, the predecessor to section 186.22[, subdivision] (b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Ibid*.) Similarly, in *People v. Montes* (2003) 31 Cal.4th 350, the court examined in detail the 1988 enrolled bill report, which summarized the terms that would be affected by what is now section 186.22, subdivision (b)(5), and noted that the terms of first degree murder would be affected only when there were no special circumstances. (*People v. Montes*, at p. 358, fn. 10.)

Because a term of life without parole does not have an anticipated parole date, it would be anomalous to impose a minimum parole date on such a term. Therefore, we conclude the trial court properly imposed the 10-year enhancement under section 186.22, subdivision (b)(1)(C), rather than the minimum parole term.

### C. Gun Use Enhancement

Finally, defendant Lares contends the sentence of 25 years to life the trial court imposed on the section 12022.53, subdivision (d), gun use enhancement should be stayed under section 12022.53, subdivision (j), which states, in pertinent part, "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment."

Defendant Lares contends section 12022.53, subdivision (j), applies here because the trial court imposed the term of life without the possibility of parole based on the jury finding true the special circumstance alleged under section 190.2, subdivision (a)(21) that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or person outside the vehicle with the intent to inflict death. According to defendant Lares, the special circumstance punished the same conduct the firearm enhancement addressed—intentionally firing a gun with the intent to kill—and it did so with respect to the same crime.

Defendant Lares's contrary view notwithstanding, our state Supreme Court rejected this precise argument in *People v. Shabazz* (2006) 38 Cal.4th 55, in which the defendant argued a different special circumstance, namely section 190.2, subdivision (a)(22), provides for a longer term of imprisonment, specifically life without possibility of parole. The Supreme Court rejected that argument and held instead that the phrase "another provision of law" contained in section 12022.53, subdivision (j) must be interpreted to mean another enhancement provision, rather than any provision, as the defendant argued. Otherwise, gun use would go unpunished in the numerous crimes in which the penalty for the crime is greater than that prescribed under section 12022.53. (*Shabazz*, at pp. 67-70.)

Although defendant Lares received a term of life in prison without the possibility of parole based on the jury's true finding on the special circumstance allegation that he intentionally discharged a firearm from a motor vehicle, that special circumstance is not an enhancement. Because it is not an enhancement, the special circumstance is not

another provision of law within the meaning of section 12022.53, subdivision (j). Therefore, the trial court was not required to stay the section 12022.53 gun use enhancement it imposed on count 1.

## DISPOSITION

The judgment with respect to defendant Lares is modified by striking the section 12022.7 and section 12022.55 enhancements imposed on counts 4 and 7, and staying execution of the section 186.22, subdivision (b)(5) enhancement imposed on counts 8, 9, 10, and 11.  Except as modified, the judgment is affirmed in all other respects.

The judgment with respect to defendant Sambrano is modified by staying the section 186.22, subdivision (b)(5) enhancement imposed on counts 3, 4, 8, 9, 10, and 11. Except as modified, the judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
                                                                    J.

We concur:


HOLLENHORST_____
              Acting P. J.


KING_____
              J.

41