Filed 12/27/13  P. v. Luna CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD LUNA,<br><br>        Defendant and Appellant. | B244484<br><br>(Los Angeles County<br> Super. Ct. No. BA358364) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed as Modified.

        Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

        A jury convicted defendant Richard Luna of the first degree murders of Tommie Hayes (count 1) and Kevin Cohen (count 2) (Pen. Code, § 187, subd.

(a).)[1]  As to both murders, it found true the multiple murder special circumstance (§ 190.2, subd. (a)(3)), and as to the Hayes murder alone, it found true the murder for financial gain special circumstance (§ 190.2, subd. (a)(1).)  It further found that defendant used a handgun in the murders.  (§ 12022.53, subds. (b), (c), and (d).)  He was sentenced to life without parole, plus 25 years, on each count, consecutively.  He appeals from the judgment of conviction.  We affirm.

## EVIDENCE

*The Killings*

Shortly before 5:00 a.m. on April 12, 2009 (Easter Sunday), Tommie Hayes and Kevin Cohen were shot to death at the Lamp Lodge, a hotel frequented by transients on Stanford Avenue between 6th and 7th Streets in the skid row area of Los Angeles.  When police arrived, they found Hayes, a security guard at the hotel who also sold drugs there, lying dead on the floor of the television room.  They found Cohen, who apparently was visiting, lying in the parking lot.  Hayes had been shot eight times, with entry wounds in his chin, right side (two wounds), back (four wounds) and left buttock.  Three 9-millimeter or larger caliber slugs were later recovered from his body.  Cohen had been shot once, the entry wound being in the left hip, the bullet exiting through his upper right chest.

In the television room, police recovered nine .9 millimeter shell casings (all later determined to have been ejected from the same gun) and five bullets.  They also observed several bullet holes in a couch.  A window of the television room

---

[1]  All undesignated section references are to the Penal Code.
Defendant was jointly charged with Lamont Ward and Shanana Flores.  Flores pled guilty to voluntary manslaughter and agreed to testify against defendant and Ward in exchange for a sentence of 12 years.  Defendant and Ward were tried at the same time before separate juries.  Ward was convicted, but is not a party to this appeal.

2

was broken, and broken glass lay around Cohen's body in the parking lot, suggesting that he had been shot in the television room and jumped through the window to escape.

*Shanana Flores' Testimony*

Shanana Flores, an accomplice in the murders (see fn. 1, *ante*), described the circumstances surrounding the killings. She testified that she and her girlfriend, Maria, frequented the Lamp Lodge where she and others sold drugs for Lamont Ward. Tommie Hayes ran his own drug business there in competition with Ward.

A couple of days before the murders, Ward and Hayes argued over their drug dealing. Ward told Hayes that the Lamp Lodge was Ward's building, that they were going to have to fight over it, and that one of them "needed to be taken out."

The night before the killings, Flores became upset with Hayes because he was giving Maria heroin in exchange for selling crack cocaine. Flores ran into Ward outside the Lamp Lodge and gave him a ride in her truck. Ward was on the phone and told her that he was "having a conversation with [one of his] boys," and that he was "tired of Tommie's shit" and "need[ed] to get rid of him." He expressed dissatisfaction with "his boys," and asked Flores if she knew anyone who would sell a gun. Flores said yes, remembering having met defendant a month or so earlier at a party, where he displayed a ".9 Glock" handgun and told her, "Just call me. I'll do anything."

Flores dropped Ward off at the Lamp Lodge. Later, Ward called and asked "what's up with your boy?" Flores called defendant, picked him up at his house, and drove toward the Lamp Lodge. Ward called Flores and she told him that defendant was with her. Flores then acted as the conduit between Ward on the

3

phone and defendant in the car. Ward asked to buy defendant's gun, but defendant said that he did not want to sell it. Ward asked if defendant would "do the job?" Defendant asked what was in it for him. Ward offered "anything that is on the body." Defendant said he wanted additional money as well. Ward offered $3,000 to $5,000. Defendant agreed.

Around 4:32 a.m. (as indicated by a security video from a nearby building played at trial), Flores and defendant arrived at the Lamp Lodge. Flores parked nearby, and she and defendant smoked some methamphetamine. Flores was in phone contact with Ward, who told her to drop defendant off in the middle of the block on Stanford. After defendant exited her vehicle, Flores drove around the block and parked on 7th Street as instructed by Ward.

A few minutes later, defendant returned, angry that Ward had not arranged things for the killing. Defendant complained that "the guy," referring to Hayes, was not outside, and that "Mesquito," referring to a resident of the Lamp Lodge named David Amezquita who sold drugs for Hayes, had seen him pull out a gun. Defendant said that he was not leaving until he did what he had to do and killed Hayes. At defendant's direction, Flores called Ward, who promised to "get this right." While on the phone with Ward, Flores heard him tell "Jeff," the manager of the Lamp Lodge, to turn off the television monitor and open the door so that defendant could enter. She also heard him tell Amezquita and other residents to go to their rooms.

Defendant left Flores parked on 7th Street and walked toward the Lamp Lodge. Shortly thereafter, Flores heard "a lot" of gunshots. Defendant returned to Flores' truck. He was angry and said that "nothing was fucking right. Everything was messed up." He complained that he had gotten no money from the body. He struck Flores in the face, and told her that she needed to get him his money or that

4

"the same thing" could happen to her children. Flores and defendant then drove off.

Flores called Ward and told him that she needed to give defendant some money. She dropped defendant off at his residence in Boyle Heights, and drove to Ward's house. Ward gave Flores about $500. She drove to defendant's house and gave him the money. Defendant said that it was not enough. He also demanded to go somewhere to "cash the money," because he did not want to carry around so many bills. Flores took him to PLS Check Cashers, where defendant exchanged the cash for a money order.

A couple of days later, defendant demanded more money from Flores. Ward had no more money, so he gave Flores drugs to sell. She raised $200, which she gave to defendant.

*Other Evidence*

A surveillance video spanning 4:31 to 5:00 a.m. on the morning of the killing, taken from the area of the Lamp Lodge, was played for the jury. As narrated by Flores, the video showed her dropping defendant off mid-block as directed by Ward, defendant walking toward the Lamp Lodge the first time and then returning to Flores' vehicle, defendant later meeting Ward outside the Lamp Lodge after Ward tried to clear out bystanders, Ward's car leaving the scene after the shooting, and defendant walking down 7th Street back to Flores' vehicle.

On the morning of the killings, Renell Collins was in room 103 at the Lamp Lodge.[2] Ward entered and said, "You might want to get your shit out of here . . . because some shit about to go down. . . . Tommie might be about to get his due."

_____

[2] Collins was unavailable at trial and his preliminary hearing testimony was read to the jury.

5

When Collins went outside, he saw Hayes sitting on the stairs. He saw Ward exit the Lamp Lodge and talk on his phone. Ward told Collins to get Amezquita, who was standing in front of the Lamp Lodge, out of the area. Collins called to Amezquita, who joined him, and Hayes went inside the hotel. Collins heard 7 to 10 gunshots, and saw Cohen dive out a window and land in the parking lot. A short Hispanic man in a hoodie exited the front door of the hotel and walked on Stanford toward 7th Street. Collins later selected defendant's photographs in a six-pack as looking similar to the man. Defendant was a short male Hispanic (5'3" tall, weighing 130 pounds), and according to Flores was wearing a black hooded jacket and black pants.

Before the killings, William Bird was waiting across the street from the Lamp Lodge to buy crack cocaine from Hayes.[3] He saw two Hispanic men, the shorter of whom he identified as defendant, walk to the Lamp Lodge. Defendant wore dark clothes, a hooded sweatshirt, and a beanie. A Caucasian man exited the Lamp Lodge, and talked to defendant and the other man, and then let them in. Bird then heard multiple gunshots, and saw defendant and the other Mexican man exit the Lamp Lodge and walk fast down 7th Street.

Nadia Chavez, the manager of the PLS Check Cashers where Flores took defendant after the killings, testified that a man, whom she identified as defendant, and a woman entered the business around 7:00 a.m. on the morning of the murders. Defendant wanted to exchange small bills for large bills, but Chavez told him he could not do that. She suggested that he get a money order instead. Defendant purchased a $500 money order. Defendant returned later that day and cashed the money order.

---

[3]     Bird was unavailable at trial and his preliminary hearing testimony was read to the jury.

6

After Flores was arrested, she cooperated with the police, and they arranged for her to talk to defendant, who was in custody, by phone. In the conversation, which was recorded and played for the jury, Flores asked defendant how much "Q" (Ward's nickname) owed him. Defendant replied, "whatever he feels on owing," and said, "[A]ll I'm asking for is to take care of me while I'm in here." Defendant admitted he already had been paid $700 and told Flores that he wanted additional money delivered to his mother's address. He asked Flores to "talk to him for me," and ask "if you can spare frickin' a thousand" as a partial payment.

At one point, Flores stated that "[y]ou did that hit, fool," and referred to defendant having threatened her ("you came at me[] fucking[] strong and shit," saying "you better get my money," and "scared the shit out of me"). Defendant told her that she and he were "squared away" and were friends. Flores asked, referring to Cohen, "Who was . . . that other fucking black dude[?]" Defendant said that he did not know what she was talking about. Flores said, "[S]ome other black fool that was . . . [i]nside the room with them." Defendant said, "I don't know," and "I didn't see nobody."

The police also arranged for Flores to visit defendant in jail. A recording of their conversation was played at trial. In the conversation, Flores said that "Q" was "tripping" because defendant was in custody. Defendant replied, "Oh, he thinks that." Flores responded, "Yeah." Defendant then said, "No." Flores complained that she had told Ward that he still owed them money. Defendant told Flores, "Just tell him he could send it . . . and put it on the books," referring to defendant's account at county jail.

Cell phone records showed five calls between Flores' and defendant's phones on the morning of the murder between 3:59 a.m. and 4:23 a.m. Based on signals from directional towers, Flores' phone was moving from Boyle Heights

(where defendant lived) toward the Lamp Lodge.  There were calls between Flores' phone and Ward's phone at the following a.m. hours:  4:23, 4:34, 4:40, 4:46, 4:47, 4:49, and 4:57.  In the first three calls, Ward's phone alone was near the Lamp Lodge;  in the rest, both Ward's and Flores' phones were in that area.

At 5:00 a.m., Ward's phone made a call from a location further away from the Lamp Lodge, indicating that he was leaving the scene.  Defendant's phone made two calls at 5:03 and 5:09 a.m. from locations traveling away from the Lamp Lodge.  At 5:38 and 5:40 a.m., Flores' phone called Ward's twice, then at 6:55 a.m. Flores' phone called defendant's.

*Defense Evidence*

Defendant called Robert Byrd, who lived at the Lamp Lodge and had worked security there.  The morning of the shooting, he was in the computer room and heard someone say, "What's up, homie?"  He then heard two shots, and saw a man about 5 feet, 8 inches tall wearing a black hooded jacket move toward the front entrance.

# DISCUSSION

I.  *Instructions on Voluntary and Involuntary Manslaughter*

Defendant contends that with respect to the killing of Kevin Cohen, the trial court erred by not instructing the jury on voluntary and involuntary manslaughter. He reasons that the evidence suggested that he was unaware of Cohen's presence in the television room when the shooting occurred:  defendant was intoxicated, he expected Ward to clear out bystanders, and when Flores asked him in their phone conversation while defendant was in county jail who was the "other black fool that

8

was . . . [i]nside the room with them," defendant said, "I don't know," and "I didn't see nobody."

According to defendant, this evidence suggests that he did not see Cohen and did not know that he shot him, either because defendant was intoxicated or because events happened quickly and he did not expect anyone other than Hayes to be present in the television room. In those circumstances, defendant argues, he would have acted without malice in the killing of Cohen, and should have received instructions on voluntary and involuntary manslaughter.

Defendant's reasoning is foreclosed by California law. Under the transferred intent doctrine, on which the jury was instructed, "a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*People v. Bland* (2002) 28 Cal.4th 313, 323–324.) Here, defendant effectively concedes (as he must) that the evidence proved that he killed Hayes, his intended target, in a fusillade of bullets with premeditated intent to kill, and that one stray bullet killed Cohen, an unintended target. Thus, defendant's premeditated intent to kill Hayes "transferred to" Cohen, the unintended victim, making defendant guilty of premeditated first degree murder in that killing. (*Id.* at pp. 323-324.) Defendant suggests that the transferred intent doctrine ought not apply absent a showing that the killer was or should have been aware of the bystander who was killed. However, no such limit has ever been imposed on the doctrine, and would be inconsistent with its theory: "[M]alice, either express or implied, 'does not exist in the perpetrator only in relation to an intended victim. True, an unlawful intent to kill almost always happens to be directed at an intended victim. . . . But there is no requirement of an unlawful intent to kill *an intended victim*. The law speaks in terms of an unlawful intent to kill *a* person, not *the* person *intended to be killed*.' [Citation.]" (*Id.* at p.

9

323.) Thus, whether defendant was aware of Cohen's presence or not is immaterial to his guilt of first degree murder in that killing. No matter how defendant couches the argument (and he tries several ways), the transferred intent doctrine applied to Cohen's killing, and there was no legal or evidentiary basis for instructions on voluntary or involuntary manslaughter.

II. *Corroboration of Flores*

Defendant contends that there was insufficient corroborating evidence of Shanana Flores' testimony to show that defendant committed the murders. The contention is specious. Of course, because Flores was an accomplice as a matter of law, the prosecution was required to "'produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged.'" (*People v. Szeto* (1981) 29 Cal.3d 20, 27.) But such evidence "need not corroborate every fact to which the accomplice testified or establish the corpus delicti, [and] is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. [Citation.] Corroborative evidence may be slight and entitled to little consideration when standing alone." (*People v. Fauber* (1992) 2 Cal.4th 792, 834-835.)

Here, there was more than enough independent corroborating evidence, including (with no effort to be exhaustive): (1) the security video depicting events before and after the murder; (2) the cell phone evidence connecting Flores' cell phone to Ward's and defendant's at times and places consistent with her testimony; (3) the testimony of Nadia Chavez, who corroborated Flores' testimony that defendant used the initial $500 payment for the murder to buy a money order; (4) defendant's in-custody conversations with Flores that implicitly referred to his

10

desire to be paid more money for killing Hayes; (5) the testimony of William Bird identifying defendant as having entered the Lamp Lodge immediately before the shooting, and leaving immediately after and (6) the testimony of Renell Collins, who selected defendant's photograph as looking similar to the shooter, and whose description of the man he saw leaving the Lamp Lodge immediately after the shooting was consistent with defendant's appearance. There is no question that Flores' testimony was adequately corroborated.

III. *Sentence For the Murder of Cohen*

Regardless of the number of murders charged, the information can allege only one multiple murder special circumstance (§ 190.2, subd. (a)(3)), and it should be pled separate from the individual murder counts. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1150, superseded by statute on other grounds as stated in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 163, fn. 20.) Here, the information alleged only one multiple murder special circumstance, but placed it in count 1, which charged the murder of Hayes, and referred only to that count ("It is further alleged that the offenses charged in counts 1 [*sic*] are a special circumstance within the meaning of Penal Code section 190.2(a)(3)"). The trial court submitted verdict forms to the jury that that required a finding on the multiple murder special circumstance for both count 1, the murder of Hayes, and count 2, the murder of Cohen. As to both murders, the jury found the multiple murder special circumstance true.

Based on these facts, defendant contends that he was improperly sentenced to life without parole for count 2, the Cohen murder. As best we understand the argument, it is that the multiple murder special circumstance did not mention count 2, and therefore the finding of that special circumstance in the verdict form for

11

count 2 was erroneous, and further, therefore, the life without parole sentence was unauthorized.

Defendant forfeited this contention by failing to object in the trial court. (*People v. Toro* (1989) 47 Cal.3d 966, 976, overruled on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3 [failure to object to verdict form adding a previously uncharged offense is deemed implied consent to the new charge and a forfeiture of any objection based on lack of notice].)  Defendant's failure to object to the submission of the verdict form for count 2 constituted implied consent to adding a reference to count 2 in the multiple murder special circumstance, and a forfeiture of any challenge on appeal.

In any event, any error in failing to mention count 2 in the multiple murder special circumstance as alleged in the information could not possibly have prejudiced defendant so as to require vacating his life without parole sentence. Although not expressly mentioned, count 2 was implicitly alleged as part of the multiple murder special circumstance:  it applies only if the defendant is convicted of more than one murder in the same proceeding.  Moreover, "In any one proceeding in which a [true] finding [on the multiple murder special circumstance] is made, the fact that a murder is one of multiple murders applies equally to all the murders of which the defendant is convicted" (*People v. Garnica* (1994) 29 Cal.App.4th 1558, 1563), and authorizes a capital sentence on each murder (*id.,* at pp. 1563-1564).  Thus, the immaterial failure to expressly mention count 2 in the multiple murder special circumstance does not require vacating defendant's life without parole sentence on that count.

12

IV.   *Restitution Fine*

In oral sentencing proceedings, the trial court imposed a restitution fine of $20,000.  However, the abstract of judgment reflects a restitution fine of $10,000.  Correctly noting that the trial court's oral pronouncement was erroneous, because the maximum restitution fine is $10,000 (see § 1202.4), defendant asks this court to make clear that the abstract of judgment, though inconsistent with the oral record, reflects the correct fine.  We agree that the correct amount of the fine is $10,000, and because the abstract of judgment reflects that amount, we see no need to remand the case, even though the trial court's oral pronouncement was erroneous.

V.  *Custody Credits*

Defendant contends that he is entitled 1,142 days of custody credit, rather than the 1,138 he received.  Respondent concedes the point.  We agree and will order the judgment modified.

**DISPOSITION**

The clerk of the superior court is ordered to modify the abstract of judgment to reflect custody credit of 1,142 days, and to forward the modified abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment (including the $10,000 restitution fine reflected in the abstract of judgment) is affirmed.

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

13